AMERICAN PETROLEUM INSTITUTE et al., Plaintiffs,

v.

Robert W. KNECHT et al., Defendants.

No. CV 77–3375–RJK.

United States District Court, C. D. California.

Aug. 31, 1978.

McCutchen, Black, Verleger & Shea, Philip K. Verleger, Howard J. Privett, Ward L. Benshoof, Los Angeles, Cal., for plaintiffs.

Sanford Sagalkin, Deputy Asst. Atty. Gen., Bruce A. Rashkow, William Brian Morrison, Attys., Dept. of Justice, Washington, D. C., for federal defendants.

John Roger Beers, James B. Frankel, Palo Alto, Cal., for Natural Resources Defense Council, Inc., and Sierra Club, moving for intervention.

Evelle J. Younger, Atty. Gen. of Cal., R. H. Connett, Asst. Atty. Gen., Roderick E. Walston, Donatas Januta, Deputy Attys. Gen., San Francisco, Cal., for California

Coastal Commission, moving for intervention.

## MEMORANDUM OF DECISION AND ORDER

KELLEHER, District Judge.

Plaintiffs American Petroleum Institute, Western Oil and Gas Association, and certain oil company members of the aforesaid Institute and Association brought this action against three federal officials ("the federal defendants") in their official capacities as Secretary of Commerce, Administrator of the National Oceanic and Atmospheric Administration ("NOAA"), and Acting Associate Administrator of the Office of Coastal Zone Management ("OCZM"), seeking declaratory and injunctive relief against defendants' imminent grant of "final approval" of the California Coastal Zone Management Program ("CZMP") pursuant to § 306 of the Coastal Zone Management Act of 1972, as amended ("CZMA") (16 U.S.C. §§ 1451 *et seq.*) and seeking further relief in the nature of mandamus directing the federal defendants to grant "preliminary approval" to the CZMP pursuant to § 305(d) of the Act.

In brief, plaintiffs contend that the California Program cannot lawfully be approved by the federal defendants under § 306 of the CZMA, principally for two reasons. First, the CZMP is not a "management program" within the meaning of § 304(11) of the Act in that (a) it fails to satisfy the requirements of §§ 305(b) and 306(c), (d), and (e), and regulations promulgated thereunder, as regards content specificity; and (b) it has not been "adopted by the state" within the meaning of § 306(c)(1). Second, the procedures by which the CZMP has reached the present state of development violate the CZMA, the National Environmental Policy Act ("NEPA") (42 U.S.C. §§ 4321 *et seq.*), and California statutes in that the final environmental impact statement, which differs substantially from both the draft and revised draft environmental impact statements, was not subject to formal notice and hearings, yet purports to contain one of five "elements" of the CZMP.

The action was commenced on September 9, 1977, by the filing of a complaint and application for temporary relief, pursuant to which a temporary restraining order ("TRO") and order to show cause were issued on September 12, the effect of which was to restrain the federal defendants from giving final approval to the CZMP pending further hearing on plaintiffs' motion for a preliminary injunction. Thereafter, on October 7, following a hearing on October 3 and 6, an order, agreed to by all parties[1] issued, whose effect was to (1) consolidate the hearing on the motion for a preliminary injunction with the trial on the merits (pursuant to Rule 65(a)(2), F.R.Civ.P.), (2) establish a briefing schedule, (3) provide for the lodging of evidentiary matter, and objections thereto, and (4) lift the TRO in order to permit the federal defendants (a) to disburse funds to California under the CZMA and (b) to take whatever action they deemed "necessary and appropriate," including formal approval of the CZMP under § 306[2], accompanied by the findings required under § 306. The order further provided, however, that pending entry of final judgment in this Court, any such approval under § 306 by the federal defendants would be deemed ineffective to trigger the "consistency" provisions of § 307(c) and (d). The CZMP was given final approval by Acting Associate Administrator Knecht, to whom the duty of approving or disapproving management programs submitted under § 306 had been and continues to be delegat-

---

1. Defendant California Coastal Commission had moved to intervene pursuant to Rule 24, F.R.Civ.P. which motion had been granted without objection October 3rd. Defendants Natural Resources Defense Council and Sierra Club ("NRDC"), who appeared as *amici* at the hearings, were granted permissive intervention on November 9th.

2. Without such approval there had as yet been no final "agency action" (within the meaning of the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 551(13) and 704) upon which judicial review could be predicated.

ed, on November 7, 1977. His findings were issued at that time.

Thereafter, on February 13, 14, 15 and 16, 1978, the Court held the aforesaid consolidated hearing and heard argument on cross-motions for summary judgment, and the matter was further briefed and submitted to the Court for decision.

All of the parties have agreed that there is no genuine issue as to any material fact in this case and that by examining the pleadings and the evidence in the record before it, and after consideration of the arguments made in writing and orally, the Court may proceed to a disposition on the merits, which we now do.

For reasons set forth below, the Court affirms the federal defendants' § 306 approval of the CZMP and grants judgment for defendants and against plaintiffs.

## FACTS

The following facts appear to be before the Court without dispute:

1. Plaintiff American Petroleum Institute ("API"), a corporation organized under the District of Columbia nonprofit corporation laws, is a national trade association of approximately 350 companies and 7,000 individuals engaged in the petroleum industry. Its members include companies and individuals actively engaged in exploration, production, refining and marketing of petroleum products in the United States, including the State of California and the Outer Continental Shelf off the coast of California.

2. Plaintiff Western Oil and Gas Association ("WOGA"), a corporation organized under the California nonprofit corporation laws, is a regional trade association of over 75 member companies and individuals engaged in the petroleum industry. Its members include companies and individuals responsible for in excess of 65 percent of the production of petroleum, in excess of 90 percent of the refining of petroleum, and in excess of 90 percent of the marketing of petroleum in the southern western states of the United States, including California and the Outer Continental Shelf off the coast of California.

3. Plaintiffs Champlin Petroleum Company; Chevron U.S.A., Inc.; Continental Oil Company; Exxon Corporation; Getty Oil Company; Gulf Oil Corporation; Mobil Oil Corporation; Reserve Oil & Gas Company; Shell Oil Company; Texaco, Inc.; and Union Oil Company of California ("the oil company plaintiffs") are each corporations organized under the laws of the various states and are members of API or WOGA. The oil company plaintiffs, among other activities, are engaged in the business of exploration for and production of oil and natural gas both within the state of California and on the Outer Continental Shelf ("OCS") off the California coast. Some of the oil company plaintiffs own interests in OCS leases purchased in federal lease sales under the provisions of the Outer Continental Shelf Lands Act (43 U.S.C. §§ 1331 *et seq.*). The remaining plaintiffs have interests in the coastal zone of California and/or are oil and gas consumers engaged in business in California.

4. Defendant Juanita Kreps, sued herein in her official capacity, is Secretary of the United States Department of Commerce ("Secretary") and is charged with administering the CZMA, which includes approval or disapproval of coastal zone management programs submitted by the coastal states, of which California is one. NOAA exists within the Department of Commerce. By administrative directive dated October 13, 1976, the Secretary delegated, *inter alia*, the CZMA approval function to the Administrator of NOAA and expressly reserved other powers under the Act. Defendant Richard Frank is the Administrator of NOAA and is sued herein in his official capacity. Within NOAA there exists the Office of Coastal Zone Management ("OCZM"). Defendant Robert W. Knecht is the Acting Associate Administrator ("Acting Administrator") for coastal zone management and is sued herein in his official capacity. By administrative directive dated October 20, 1976, the Administrator of NOAA delegated to the Associate Administrator for Coastal Zone Management the authority to exercise all

functions under the CZMA not expressly reserved to either the Secretary or the Administrator of NOAA.

5. The defendant-in-intervention, California Coastal Commission, is an agency of the State of California created pursuant to the California Coastal Act of 1976 (Cal.Pub.Res. Code §§ 30000, *et seq.*). The Coastal Commission is the successor in interest to the California Coastal Zone Conservation Commission created pursuant to Proposition 20 (Cal.Pub.Res.Code §§ 27000, *et seq.*), which expired on December 31, 1976. The California Coastal Act became effective on January 1, 1977.

6. Defendants-in-intervention, Natural Resources Defense Council, Inc., and the Sierra Club ("NRDC") are associations whose members claim an interest in coastal zone management.

7. On March 31, 1976, the California Coastal Zone Conservation Commission submitted to the federal defendants a coastal zone management program for approval under the provisions of CZMA § 306.

8. In September of 1976 the federal defendants issued a Draft Environmental Impact Statement ("DEIS") wherein they announced their tentative decision to approve the California Coastal Zone Management Program submitted in March. Thereafter, the State of California enacted the Coastal Act of 1976, which declared itself to be "California's coastal zone management program within the coastal zone for purposes of the Federal Coastal Zone Management Act of 1972 . . . ." (Cal.Pub.Res.Code § 30008.)

9. On October 20, 1976, the DEIS was withdrawn and the public hearings to be held thereon were cancelled. On April 12, 1977, the federal defendants issued a Revised Draft Environmental Impact Statement ("RDEIS") and announced their tentative decision to approve the revised coast-

al zone management program submitted by the Coastal Commission. At this time the CZMP was described as consisting of the California Coastal Act of 1976, the Coastal Conservancy Act (Cal.Pub.Res.Code §§ 31000 *et seq.*), and the Urban and Coastal Park Bond Act (Cal.Pub.Res.Code §§ 5096.111 *et seq.*). Public hearings were held on the RDEIS and the CZMP as therein described on May 19, 1977, in Los Angeles, California. Plaintiffs appeared and (by oral testimony and written comments submitted before the hearing and additional comments submitted thereafter) recommended that the CZMP not be approved and that a new environmental impact statement be prepared.

10. On August 16, 1977, the federal defendants issued their Final Environmental Impact Statement ("FEIS"), together with Attachment K, containing written statements from parties commenting on the CZMP. In the FEIS, the CZMP was described as consisting of five elements: the Coastal Act of 1976, the Coastal Conservancy Act, the Urban and Coastal Park Bond Act, the Coastal Commission's final regulations (Cal.Admin.Code, Title 14, §§ 13000 to 14000), and Part II (Introduction and Chapters 1–14) ("the Program Description") of the FEIS.[3] On September 1, 1977, plaintiffs submitted to the federal defendants written comments objecting to approval of the CZMP as defendants proposed in the FEIS. Defendants replied by letter dated September 8, 1977, from Acting Administrator Knecht to plaintiffs' counsel, by which letter defendants indicated that they intended to proceed with approval of the CZMP. As noted previously, final approval, accompanied by a recital of findings, occurred on November 7.

The Court has before it for determination both preliminarily and for ultimate disposition questions of the highest importance, greatest complexity, and highest urgency.

---

**3.** The FEIS document is entitled *State of California Coastal Management Program and Final Environmental Impact Statement.* The "Program Description" (FEIS at 5–107) and "Coastal Management Program Appendices" have been printed with a black border, indicating that they comprise the CZMP. The combined document was utilized for efficiency reasons, in order to avoid the necessity of duplication of the Program in a separate document as well as in the FEIS.

They arise as the result of high legislative purpose, low bureaucratic bungling, and present inherent difficulty in judicial determination. In other words, for the high purpose of improving and maintaining felicitous conditions in the coastal areas of the United States, the Congress has undertaken a legislative solution, the application of which is so complex as to make it almost wholly unmanageable. In the course of the legislative process, there obviously came into conflict many competing interests which, in typical fashion, the Congress sought to accommodate, only to create thereby a morass of problems between the private sector, the public sector, the federal bureaucracy, the state legislature, the state bureaucracy, and all of the administrative agencies appurtenant thereto. Because the action taken gives rise to claims public and private which must be adjudicated, this matter is now involved in the judicial process.

In whatever technical form the questions and issues are here presented, they resolve themselves into the familiar situation in which a court must sit in some form of judicial review of administrative action—and it isn't easy.

We deal here with a hybrid kind of record and consequent hybrid form of review. As will appear from the extensive discussion below, the several approaches to and differing views of the proper scope and kind of judicial review are here brought under consideration.

We have questions of whether review is proper or timely and, if so, of what proper scope and result. We treat each *seriatim*.

## STANDING

This issue need not detain us long. While defendants originally urged that plaintiffs in this case lack standing to litigate speculative harms, during oral argument counsel for the NRDC, to whom the task of pressing defendants' standing and ripeness contentions was apparently assigned, conceded that what had previously been designated an issue of standing was more properly characterized as a ripeness problem. The Court nevertheless briefly examines the standing of plaintiffs to maintain the present action before addressing the ripeness issue.

The Supreme Court has liberalized the law of standing so that, while injury in fact is always required, *Sierra Club v. Morton*, 405 U.S. 727, 740, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972), "an identifiable trifle is enough." *U. S. v. Students Challenging Regulatory Agency Procedures (SCRAP)*, 412 U.S. 669, 689 n. 14, 93 S.Ct. 2405, 37 L.Ed.2d 254 (1973) [quoting Davis, *Administrative Law Treatise*, § 22.09–5 at 748 (1970 Supp.)]; *National Automatic Laundry & Cleaning Council v. Schultz*, 143 U.S.App. D.C. 274, 278, 443 F.2d 689, 693 (1971). The distinction that the Court has drawn is one between actual and abstract injury.

> Abstract injury is not enough. It must be alleged that the plaintiff "has sustained or is immediately in danger of sustaining some direct injury" as a result of the challenged statute or official conduct.

*O'Shea v. Littleton*, 414 U.S. 488, 494, 94 S.Ct. 669, 675, 38 L.Ed.2d 674 (1974). *See Cady v. Morton*, 527 F.2d 786, 791 (9th Cir. 1975).

In the present case plaintiffs, whose activities will be regulated by the CZMP to the extent that their activities in exploring for and developing oil and gas resources on the OCS must be consistent therewith, have alleged and shown injury in fact. For upon approval by the federal defendants of the CZMP under § 306 of the CZMA, the consistency provisions of § 307 are triggered. Thereafter, before federal agencies may approve certain activities of plaintiffs relating to exploration and development of OCS resources, plaintiffs must certify that the proposed activity is consistent with the CZMP. Although the state is afforded six months to certify to the federal agency whether or not a proposed activity is consistent, the initial burden of determining consistency falls to the applicant. The gravamen of the complaint is that the submitted CZMP as approved by the federal defendants lacks the requisite specificity under CZMA and

consequently may not be approved under § 306. If approved, plaintiffs claim immediate and substantial harm by compulsion to expend large sums of money to determine if their proposed activities are consistent. Moreover, plaintiffs allege that this lack of specificity increases their burden and makes it impossible to discharge, since they cannot with any reasonable assuredness certify that any activity subject to § 307 is in fact consistent with the CZMP. The undeniable interest[4] of plaintiffs in the areas subject to the CZMP, the fact that once § 306 approval is given, their activities are subject to regulation under it, and the fact that an immediate consequence is to compel plaintiffs to expend financial resources in an effort to satisfy the requirements of § 307, combined with their claim that this burden is substantially increased by virtue of the very defects which they assert make approval improper, provide the necessary injury in fact to give plaintiffs standing to challenge the federal defendants' action in approving the CZMP under § 306.

Accordingly, the Court finds that the plaintiffs have standing to litigate the issues presented.

RIPENESS

On this issue the Court must delineate what issues are and are not before it for review. The Court concludes that the approval given by the federal defendants results in action which is ripe for review, but that issues relating to the state's application of § 307 of the CZMA to particular activities of plaintiffs is not ripe for review. This conclusion has impact with respect to two other issues in this lawsuit: first, plaintiffs' request that the Court undertake a full-scale declaration of the parties' rights and obligations under the CZMA and the CZMP; and, second, plaintiffs' claim that the environmental impact statement and

review process were deficient in failing to address potential impact nationwide if energy resource development in areas subject to the CZMP was retarded or halted by virtue of the state's application of its § 307 powers. The Court declines to undertake the first because such declarations are best left to a time when a court has before it a case or controversy sufficiently identifiable to allow to a specific issue application of a specific provision or provisions of the Act or Program. The Court declines the second so far as it requires the Court to assume that the state may abuse its § 307 powers and that federal officials will fail to correct such abuses under their power so to do, pursuant to the provisions of §§ 307(c)(3) and 312.

A trilogy of Supreme Court decisions[5] forms the bedrock for the modern law of ripeness. In oft-quoted language from *Abbott Laboratories*, the Court stated:

[The] basic rationale [of the ripeness doctrine] is to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties. The problem is best seen in a *twofold aspect,* requiring us to evaluate both the *fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration.*

387 U.S. at 148–49, 87 S.Ct. at 1515 (emphasis supplied).

A. *Fitness of the Issues for Judicial Decision.*

■ Courts typically focus on two factors: whether they are presented with issues that are "purely legal" (*Abbott Laboratories, supra,* 387 U.S. at 149, 87 S.Ct.

---

4. Plaintiffs have invested millions of dollars in exploration and development of energy resources located on the OCS and continue so to do.

5. *Abbott Laboratories v. Gardner,* 387 U.S. 136, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967); *Toilet Goods Association v. Gardner,* 387 U.S. 158, 87 S.Ct. 1520, 18 L.Ed.2d 697 (1967); and *Gardner v. Toilet Goods Association,* 387 U.S. 167, 87 S.Ct. 1526, 18 L.Ed.2d 704 (1967).

1507; *National Automatic Laundry & Cleaning Council, supra,* 143 U.S.App.D.C. at 280, 443 F.2d at 695; *Bethlehem Steel Corp. v. U. S. Environmental Protection Agency,* 536 F.2d 156, 161 (7th Cir. 1976)) and whether they are presented with "final agency action" (*Abbott Laboratories, supra,* 387 U.S. at 149, 87 S.Ct. 1507; *Natural Resources Defense Council, Inc. v. U. S. Nuclear Regulatory Commission,* 539 F.2d 824, 836–37 (2d Cir. 1976); *Bethlehem Steel Corp., supra,* 536 F.2d at 161).

Considering finality, or reviewability, first, the Court notes that approval under § 306 is the culmination of the agency review process here involved. Following approval, there is nothing further to be done as part of the administrative process, other than the obligation of "continuing review" under § 312(a), an obligation which relates to a management program that has already been approved under § 306. The present case is thus unlike *Bethlehem Steel Corp.,* wherein the challenged regulations were found "only [to] provide for a study by the State . . . of future air pollution problems in the designated areas. Any standards for petitioners to follow will not be promulgated until the study is completed. Our review of the challenged actions consequently will interfere with an ongoing administrative process. Because of this we cannot say the agency action is 'final'." 536 F.2d at 161.

■ The fact that agency approval is here involved rather than rule-making is of *no consequence.* Courts have heeded the Supreme Court's approval in *Abbott Laboratories* of a "pragmatic" interpretation of the finality requirement. 387 U.S. at 150,

87 S.Ct. 1507, citing *Columbia Broadcasting System v. U.S.,* 316 U.S. 407, 418–19, 62 S.Ct. 1194, 86 L.Ed. 1563 (1942) (FCC statement of intention not to license stations which maintained certain contracts with networks; no license yet denied or revoked); *National Automatic Laundry & Cleaning Council, supra* (interpretative letter of agency); *Natural Resources Defense Council, Inc., supra,* 539 F.2d at 837 (order of agency). The Court concludes that the federal defendants' approval under § 306 constituted final agency action for purposes of reviewability.

On the question of whether purely legal issues are presented, the Court notes that this is not a case in which plaintiffs are challenging agency action on the grounds that it exceeds the agency's statutory authority (as was the case in *Abbott Laboratories* and *National Automatic Laundry*). Here the agency's action involved findings in part premised on its interpretation of the CZMA (as amended in 1976); hence the Court is presented with predominantly legal issues. The facts, while not unmuddied by the nature of the administrative action here involved [6], nevertheless are not in dispute. The dispute centers on the legal characterization of such facts under the language of the statute. Thus, the federal defendants' finding under § 306(c)(8) that the California Program "provides for *adequate consideration* of the national interest involved in planning for, and in the siting of, [energy] facilities . . . which are necessary to meet requirements which are other than local in nature" presupposes a legal determination on the part of the agency as to

---

**6.** The Court is here faced with review of neither an adjudication nor rule-making, in both of which instances a clear administrative record emerges. Rather, the Court sits in review of agency action which stretches over a long period of time, includes non-transcribed public hearings, not essentially adversary in nature, and in fact, quite the contrary. Cooperative efforts on the part of the state and the agency produced the environmental impact statement. At times the Court *has the sense that the rec-ord by its very nature permits only an occasional brief glance into the workings of the administrative decision-making process in this* instance. Perhaps prompted in part by difficulties of this sort which inhere in attempts to review such action, courts have held that in circumstances like the present—that is, where agency approval of a specific program or project is involved—"from the standpoint of effectuating Congressional intent, it is the Administrator's approval of the project in the first instance that becomes the all-important step in the process. And it is the Administrator's approval that should be the focal point for judicial review." *Air Line Pilots Association v. Dept. of Transportation,* 446 F.2d 236, 242 (5th Cir. 1971).

just what is meant and required by "adequate consideration." This in turn requires an examination of Congress' intent in enacting and amending the CZMA. To be sure, this case does not fit neatly into the category of case typified by *National Automatic Laundry*. There the court could state: "There is no 'record' to be studied or made, for the only record involved on this issue is that established by such materials as the law and its legislative history." 143 U.S.App.D.C. at 280, 443 F.2d at 695. Here, on the other hand, the very statute whose provisions must be construed requires that before approving a management program under § 306, the agency find that it includes certain substantive provisions and that it has been adopted in accordance with certain procedures. Consequently, at the same time that the Court must construe the statute, it must review administrative findings subject to the limited review under § 706(2)(A) of Title 5, the Administrative Procedure Act ("APA"). The complexity arises from the fact that many of those findings present classic examples of mixed questions of law and fact, further complicated by their essentially technical nature.

The Court's conclusion is supported further by the fact that the findings required under § 306 involve the agency's comparison of the provisions of the CZMP with the CZMA and regulations promulgated thereunder, at least with respect to the requirements of the Act relating to substantive program content. As noted previously, nothing remains to be done by the agency vis-á-vis § 306 approval. If the propriety of that approval is not ripe for judicial review at this time, it will never be ripe.

Finally, the Court notes that, irrespective of the above characterization, whether the issues presented are legal is merely a factor to be balanced against hardship to the parties; it is not a requirement in the absence of which the Court must find the action unripe for review. In pre-enforcement judicial review of agency action, typically the agency argues that the legal issues are too abstract or speculative to be determined in advance of their being shaped and sharpened by efforts to enforce them, or that the very fact of enforcement is uncertain. Where "consideration of the underlying legal issues would necessarily be facilitated if they were raised in the context of a specific attempt to enforce the regulations" (*Gardner, supra*, 387 U.S. at 171, 87 S.Ct. at 1528), a court might and probably should conclude that the matter is not ripe; but where the issues would not be sharpened thereby, ripeness is more readily found.

Here, the Court in applying the above principle concludes that issues specifically related to application of the § 307 consistency power are wholly speculative and thus not ripe for review. On the other hand, review of the agency's approval predicated on its impact on plaintiffs' interests is non-speculative. As defendants have stated, the propriety of the approval stands or falls on the record made before the agency and the support it lends to the administrator's findings that the CZMP, both in content and in manner of adoption and approval, meets the requirements of the CZMA.

B. *Hardship to the Parties of Withholding Court Consideration.*

In *Abbott Laboratories*, in finding petitioners' preenforcement challenge to certain labelling regulations promulgated by the Commissioner of Food and Drugs ripe for review, the Court emphasized the hardship to petitioners if judicial review were deferred. In so doing the Court focused on the impact on petitioners of deferring review:

This is also a case in which the impact of the regulations upon petitioners is sufficiently direct and immediate as to render the issue appropriate for judicial review at this stage. These regulations purport to give an authoritative interpretation of a statutory provision that has a direct effect on the day-to-day business of all prescription drug companies; its promulgation puts petitioners in a dilemma that it was the very purpose of the Declaratory Judgment Act to ameliorate. . . .
The regulations are clear-cut, and were made effective immediately upon publica-

tion . . . . If petitioners wish to comply they must change all their labels, advertisements, and promotional materials; they must destroy stocks of printed matter; and they must invest heavily in new printing type and new supplies. The alternative to compliance . . . may be even more costly. That course would risk serious criminal and civil penalties . . . .

387 U.S. at 152–53, 87 S.Ct. at 1517. Similarly, in finding the issue of what sort of items are "color additives" within the meaning of the Color Additive Amendments of 1960 to the Food, Drug, and Cosmetic Act, 21 U.S.C. § 321(t)(1), to be ripe for review in light of regulations relating thereto which respondents challenged as beyond the Commissioner's statutory authority to promulgate, the Court stressed the fact that "these regulations are self-executing, and have an immediate and substantial impact upon the respondents." *Gardner, supra,* 387 U.S. at 171, 87 S.Ct. at 1528.

The significance of this requirement of immediate and substantial impact is underscored by the Court's finding of a lack of ripeness in the remaining case in the above trilogy. In *Toilet Goods Association,* after having agreed with the Court of Appeals that the agency action was final and that the question presented was purely legal (387 U.S. at 162–63, 87 S.Ct. 1520), the Court nevertheless found these factors outweighed by other considerations—chiefly the facts that (1) the regulation was not self-executing but merely gave notice of what the agency might do in the future, (2) justification for the regulation would depend "not merely on an inquiry into statutory purpose, but concurrently on an understanding of what types of enforcement problems are encountered by the FDA, the need for various sorts of supervision in order to effectuate the goals of the Act, and the safeguards devised to protect legitimate trade secrets" (*id.* at 163–64, 87 S.Ct. at 1524), and (3) immediate and substantial impact was lacking. While the second factor relates to the fitness of the issues, the first and third relate to hardship. In analyzing the lack of such in the case before it

and contrasting it with the sort of impact "felt immediately by those subject to it in conducting their day-to-day affairs" (*id.* at 164, 87 S.Ct. at 1524), the Court remarked:

This is not a situation in which primary conduct is affected—when contracts must be negotiated, ingredients tested or substituted, or special records compiled. This regulation merely states that the Commissioner may authorize inspectors to examine certain processes or formulae; no advance action is required of cosmetics manufacturers . . . . Unlike the other regulations challenged in this action, . . . a refusal to admit an inspector here would at most lead only to a suspension of certification services to a particular party, a determination that can then be promptly challenged through an administrative procedure, which in turn is reviewable by a court. Such review will provide an adequate forum for testing the regulation in a concrete situation.

*Id.* at 164–65, 87 S.Ct. at 1524–1525.

From the above, it is evident that the Court is here faced with a problem of classification: Are the consequences of which plaintiffs complain—not those flowing from the manner in which California might exercise its § 307 powers but rather those involving the need of plaintiffs to take steps to certify their proposed activities as consistent with the CZMP—consequences of "immediate and substantial impact"? More specifically, is the uncertainty in the conduct of the affairs which plaintiffs claim follows from § 306 approval of the CZMP the sort of impact on day-to-day activities that courts have typically found to be a sufficient hardship to support a finding of ripeness?

First, it should be noted that the *Abbott Laboratories* standard refers to hardship to the "parties," not merely the plaintiff. The agency may benefit as much as the private complainant from prompt judicial review of the challenged action. Perhaps more than any other single factor, placing an entire program of the breadth, dimension, and significance of the CZMP in a position where subsequent challenges could be made to the

contents and manner of adoption of the entire CZMP would be intolerable from the point of view of the state and federal defendants. The state, in reliance on the approval and attendant receipt of millions of dollars in administration funds (80 percent of the costs thereof being borne by the federal government), will have proceeded to implement the CZMP in a variety of ways (e. g., staffing, acquiring fee title to certain lands). The federal defendants, faced with applications for § 306 approval from other coastal states, and in reliance on the legality of the procedures utilized in adopting and approving the CZMP and in reliance upon their interpretation of the requirements of the CZMA, may proceed to approve other programs, the validity of which approval would then be cast in doubt. Given that all facts pertinent to a determination of whether the federal defendants' approval was proper have occurred and nothing that may occur hereafter can in any way alter the record upon which approval was premised, substantial hardship may result from deferring a decision on the merits.

Second, from plaintiffs' perspective, the hardship attendant upon having to determine whether present and planned activities are consistent with a program which has received § 306 approval is severe, particularly in light of the contention that the very lack of specificity which makes compliance difficult if not impossible makes the approval unlawful under the CZMA. The cases which refer to uncertainty in business activities and increased costs do not resolve the questions posed earlier, though they tend to favor plaintiffs in this action. For example, in *Bethlehem Steel Corp., supra*, plaintiffs sought review of regulations of the Environmental Protection Agency, designating certain areas in Indiana as air quality maintenance areas. The court found the matter unripe for review, noting that "petitioners are not required to do anything nor to refrain from doing anything." 536 F.2d at 162. Petitioner steel and power companies had argued that they suffered immediate injury as a result of the designations because uncertainties in their business operations were thereby created—

for example, the need to maintain capital to cover the possible expenditure of funds for pollution control equipment in the event more restrictive air pollution regulations were applied. The court rejected these arguments, finding the claims of uncertainty "not sufficient to warrant our review of an ongoing administrative process. . . . [T]he claims . . . do not involve injuries on the order of . . . concrete immediate business costs . . . ." *Id.* It further noted that petitioners "need not expend any funds at this time since there is no administrative directive to which they must comply, nor, of course, do they face any sanctions for noncompliance." *Id.* at 163. Plaintiffs here have argued that they do incur immediate business costs by virtue of § 306 approval and that they must comply with § 307 or face refusal of permits, licenses, and other manifestations of federal agency approval of particular activities they may desire to undertake on the OCS. In *Phillips Petroleum Co. v. Federal Energy Administration*, 435 F.Supp. 1239 (D.Del. 1977), plaintiffs challenged the agency's interpretation and contemplated application of a 1973 regulatory scheme dealing with the method by which plaintiffs priced petroleum products as a result of increased costs incurred over a given thirteen-month period. The court found that the agency action had a direct and immediate impact on the plaintiffs' conduct of their business.

> Each month that passes without resolution of the present controversy threatens plaintiffs with a dilemma. If they actually charge the prices that they believe they are lawfully entitled to charge, they risk FEA action requiring price rollbacks, cash refunds, and substantial civil and criminal penalties, as well as private treble-damage actions. On the other hand, if plaintiffs forebear from such pricing, they may be forced unnecessarily to delay further in recovering costs they have actually incurred, and they may be permanently barred from recovery by missing market opportunities that will never be repeated.

*Id.* at 1246–47. *See Commonwealth of Puerto Rico v. Alexander,* 438 F.Supp. 90 (D.D.C.1977) (expenses required to comply with the challenged regulations found to be injury in fact).

One problem the Court here faces in determining the existence of substantial immediate impact is the emphasis the cases appear to place on plaintiffs being placed in a "dilemma" should the Court defer review. *See, e. g., Abbott Laboratories, supra,* 387 U.S. at 152, 87 S.Ct. 1507, *Gardner, supra,* 387 U.S. at 171, 87 S.Ct. 1526 ("quandry"); *National Automatic Laundry, supra,* 143 U.S.App.D.C. at 281, 443 F.2d at 696. Arguably any costs of determining consistency which plaintiffs must bear after § 306 approval result from the congressional scheme; and any increased costs due to the alleged unlawful lack of specificity in the CZMP are speculative. Similarly, any detriment to plaintiffs which results from the six-month period which Congress has afforded a state to exercise its § 307 power before consistency is conclusively presumed is not a matter with respect to which plaintiffs may be heard to complain. The difficulty is that to the extent plaintiffs have a substantial interest in having the CZMP comply with the CZMA, if review, particularly of the manner of adoption and approval, is here denied, it is unclear whether such review will ever occur, and it is clear that if it does the hardship to the state and the federal defendants which would result from a successful challenge must also be considered. The court in *Bethlehem Steel Corp.* recognized the validity of this factor.

> The other consideration to be taken into account in determining whether there is sufficient hardship to the parties to warrant our review is that of whether the challenged action will be reviewable in the future. If it will not be reviewable later, our review now may be warranted to protect the right of the parties to have the issues heard in court.

536 F.2d at 163.

*C. Conclusion.*

Having examined the facts of this case in light of the above precedents, the Court finds that the issue of ripeness is a close question and takes to heart the admonition of the Seventh and District of Columbia Circuits:

> The determination to be made is the imprecise one of considering and balancing the relevant factors. It is "very much a matter of practical common sense," *Continental Air Lines, Inc. v. C. A. B.,* [173 U.S.App.D.C. 1, 18,] 522 F.2d 107, 124 (D.C.Cir.1975).

*Bethlehem Steel Corp., supra,* 536 F.2d at 160.

■ The Court concludes that the approval of the federal defendants of the CZMP under § 306 of the CZMA is ripe for review. First, the agency action challenged herein is final. Second, while there are mixed questions of law and fact involved in the agency's findings under § 306, the facts are either documentary or not in dispute and the law is a proper subject for judicial review. Third, consideration of the issues involved in the § 306 approval would not be sharpened by further actions taken with respect to the Program. Review of that which has occurred would not be further particularized by awaiting a challenge to a refusal of the state to certify one of plaintiffs' proposed activities as consistent with the CZMP. Fourth, while plaintiffs are not faced with the classic dilemma found in *Abbott Laboratories,* nevertheless they do face the onerous task of complying with a program whose provisions they claim are too uncertain to permit approval under § 306 properly to have occurred. Fifth, the magnitude, impact, and significance of the CZMP, and the interests of the state and federal government in connection therewith, bespeak the need to resolve at the earliest practicable date the challenges to its approval, particularly those directed toward the manner by which it was adopted by the state and approved by the federal defendants. Severe hardship could accrue to defendants (particularly the state defendant) should a successful challenge be mounted subsequent to its implementation. Sixth, the public interest demands that claims that federal statutes have been vio-

lated (the CZMA and NEPA) should receive a judicial forum. The propriety of the § 306 approval will never be more ripe for disposition. If not challenged at this time, important public interests may never receive the judicial forum to which they are entitled.

The Court concludes further that no issues regarding § 307 are presently ripe for disposition. Whether the state will utilize its consistency powers improperly to retard or halt energy development are wholly speculative. No specific activities contemplated by plaintiffs have been presented or form any part of the record in this case; no anticipated refusals to certify have been alleged or presented. The construction of particular provisions of the CZMP will have to await the presentation of a concrete controversy over their meaning or application to specific activities. Similarly, the Court concludes that there is no need to engage in a treatise-like recital of each provision of the CZMA. Such construction of provisions and regulations as is necessary to review the federal defendants' findings under the limited standard of review applicable to this case will be undertaken. As with the CZMP, a detailed treatment of various provisions of the CZMA must await a more concrete dispute than is here presented for resolution.

## STANDARD OF REVIEW

The standard of review has been the subject of serious dispute between the parties. Plaintiffs argue that while purely factual determinations made by an administrative agency without formal hearings are governed by the "arbitrary or capricious" standard of 5 U.S.C. § 706(2)(A), nevertheless purely legal determinations, determinations of both questions of fact and law (such as mixed questions), and determinations of fact questions predicated on documentary evidence which the reviewing court is in as good a position as the agency to appraise all permit a reviewing court to undertake *de novo* review and to substitute its judgment for that of the agency, particularly where the agency possesses no special technical qualifications or long-standing expertise with respect to the subject matter of the challenged action. Plaintiffs argue that the federal defendants' § 306 approval of the CZMP falls within the above categories warranting *de novo* consideration.

The starting point for any inquiry into the appropriate standard of review of agency action is § 10 of APA, 5 U.S.C. § 706:

To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall—

. . . . .

(2) hold unlawful and set aside agency actions, findings, and conclusions found to be—

(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

. . . . .

(C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;

(D) without observance of procedure required by law; . . . .

As with so many statutory standards, the case law has placed a significant gloss on the meaning of the literal language, affecting its applicability in various contexts, its meaning, and the factors to be considered in determining whether the administrative action under review falls within the standard thus established.

One problem initially to be resolved is the ambiguous overlap among the "arbitrary and capricious," "excess of statutory authority," and "without observance of procedure" standards set forth in paragraphs (A), (C), and (D) of § 706(2), inasmuch as all apply to "agency action, findings, and conclusions." Few cases deal with this difficulty; and the parties to this litigation have argued throughout for application of paragraph (A) alone or *de novo* review of what have been characterized as mixed questions of fact and law.

The Court distinguishes between (a) review of the federal defendants' decision to approve the CZMP based on the Acting Administrator's finding that its contents and manner of adoption by the state satisfied the substantive and procedural requirements of the CZMA, and (b) review of the agency's determination that the manner of § 306 approval satisfied the procedural requirements of CZMA and NEPA. As to the former, the arbitrary and capricious standard governs; but as to the latter, the Court focuses its review on the observance of procedure standard. *Cady v. Morton, supra,* 527 F.2d at 793 (referring to the standard as *"ad hoc* in character"), citing *Lathan v. Brinegar,* 506 F.2d 677 (9th Cir. 1974) and *Trout Unlimited v. Morton,* 509 F.2d 1276, 1282 (9th Cir. 1974) (the procedural standard "is less helpful in reviewing the sufficiency of an EIS than one might wish").[7]

A distinction must also be made with regard to the applicability of the observance of procedure standard to this case. To the extent that the Acting Administrator is required under the CZMA to find that certain procedures were followed in placing the CZMP before him for § 306 approval—these procedures relating to the fact and manner of adoption of the CZMP by the state—as noted above, the arbitrary and capricious standard applies. The observance of procedure standard applies to the procedures required of the federal agency in undertaking § 306 approval. These are the procedures required by § 306 of the federal agency itself and also those required by NEPA with respect to the environmental impact review process.

The arbitrary and capricious standard of review has been the subject of judicial opinions too numerous to cite here. It has been construed by the Supreme Court in *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 416, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1971).

> To make this finding the court must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment. [Citations omitted.] Although this inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow one. The court is not empowered to substitute its judgment for that of the agency.

Quoted in *Bowman Transportation, Inc. v. Arkansas-Best Freight System, Inc.,* 419 U.S. 281, 285, 95 S.Ct. 438, 442, 42 L.Ed.2d 447 (1974) ("The agency must articulate a 'rational connection between the facts found and the choice made'").

This standard of review was treated at length in a thoughtful opinion by the District of Columbia Circuit in *Ethyl Corp. v. EPA,* 176 U.S.App.D.C. 373, 541 F.2d 1 (1976). In reviewing a challenge to informal rule-making by the EPA requiring annual reductions in the lead content of gasoline pursuant to its authority under

---

7. The excess of statutory authority standard applies only to the extent that it authorizes judicial review of the agency's construction of the CZMA. *Ethyl Corp. v. EPA,* 176 U.S.App. D.C. 373, 406 & n.71, 541 F.2d 1, 34 & n.71, *cert. denied,* 426 U.S. 941, 96 S.Ct. 2663, 49 L.Ed.2d 394 (1976). Here, there is no claim that the Acting Administrator's § 306 approval exceeded his statutory authority except to the extent that the findings (and statutory construction) on which it was based are assailable under the arbitrary and capricious standard and in that sense unauthorized. Nor is the agency's authority to promulgate regulations under §§ 305 and 306 called into question. Thus, the excess of statutory authority standard has no significant bearing on this Court's review of the § 306 approval.

The "substantial evidence" standard for agency findings of fact (5 U.S.C. § 706(2)(E)) is inapplicable in that the substantial evidence test applies only to review of findings made on a hearing record. *Tiger International, Inc. v. CAB,* 554 F.2d 926, 935–36 (9th Cir. 1977), construing *Camp v. Pitts,* 411 U.S. 138, 141, 93 S.Ct. 1241, 36 L.Ed.2d 106 (1973). *Accord, California Citizens Band Association v. U. S.,* 375 F.2d 43, 53–54 (9th Cir.), *cert. denied,* 389 U.S. 844, 88 S.Ct. 96, 19 L.Ed.2d 112 (1967). *See Hughes Air Corp. v. CAB,* 482 F.2d 143 (9th Cir. 1973). In this case, the agency was not required to act on the basis of a recorded hearing and the public hearings held provided an opportunity for the submission of comments and information to the agency, to be utilized by it in arriving at its determination under § 306 of CZMA.

§ 211(c)(1)(A) of the Clean Air Act, the court stated:

This standard of review is a highly deferential one. It presumes agency action to be valid. [Citation omitted.] Moreover, it forbids the court's substituting its judgment for that of the agency [citations omitted] and requires affirmance if a rational basis exists for the agency's decision. [Citations omitted.]

This is not to say, however, that we must rubber-stamp the agency decision as correct. To do so would render the appellate process a superfluous (although time-consuming) ritual. . . . This is particularly true in highly technical cases.

. . . . .

There is no inconsistency between the deferential standard of review and the requirement that the reviewing court involve itself in even the most complex evidentiary matters; rather, the two indicia of arbitrary and capricious review stand in careful balance. The close scrutiny of the evidence is intended to educate the court. It must understand enough about the problem confronting the agency to comprehend the meaning of the evidence relied upon and the evidence discarded; the questions addressed by the agency and those bypassed; the choices open to the agency and those made. The more technical the case, the more intensive must be the court's effort to understand the evidence, for without an appropriate understanding of the case before it the court cannot properly perform its appellate function. But that function must be performed with conscientious awareness of its limited nature. The enforced education into the intricacies of the problem before the agency is not designed to enable the court to become a superagency that can supplant the agency's expert decision-maker. To the contrary, the court must give due deference to the agency's ability to rely on its own developed expertise. [Citation omitted.] The immersion in the evidence is designed *solely* to enable the court to determine whether the agency decision was rational and based on consideration of the relevant factors. [Citation omitted.]

Thus, after our careful study of the record, we must take a step back from the agency decision. We must look at the decision not as the chemist, biologist or statistician that we are qualified neither by training nor experience to be, but as a reviewing court exercising our narrowly defined duty of holding agencies to certain minimal standards of rationality.

*Id.* 176 U.S.App.D.C. at 406, 541 F.2d at 34–36 (emphasis original).

The court noted that despite the use of "clear error of judgment" in *Overton Park,* the Supreme Court did not intend thereby to supplant the arbitrary and capricious standard with the broader-ranging review of district court fact findings permitted an appellate court under the "clearly erroneous" standard of Rule 52(a), F.R.Civ.P. The court concluded: "Accordingly, in the context of 'arbitrary and capricious' review, we shall reverse for a 'clear error of judgment' only if the error is so clear as to deprive the agency's decision of a rational basis." 176 U.S.App.D.C. at 407 n.74, 541 F.2d at 35 n.74.

■ While the agency's decision need not be based on substantial evidence, nevertheless "a decision must be considered 'arbitrary and capricious' if the facts on which it is purportedly based are not supported by the record." *National Citizens Committee for Broadcasting v. FCC,* 181 U.S.App.D.C. 1, 19, 555 F.2d 938, 956 (1977).

As noted previously, one of the features of this litigation which adds complexity to the standard of review issue is the fact that in undertaking to approve the CZMP under § 306, the Acting Administrator is required to make certain findings, both as to content and manner of adoption by the state; yet these findings necessarily embrace a judgment on his part as to what the statute requires and what the agency's regulations themselves require, particularly with regard to (1) the specificity of a program's content under §§ 305(b) and 306(c), (d), and (e) and with regard to (2) what constitutes "ade-

quate consideration of the national interest" under § 306(c)(8). Thus, the Court in reviewing § 306 approval must also review the Acting Administrator's construction and interpretation of the CZMA and the regulations promulgated thereunder.

█ That deference is due an agency's interpretation of its own regulations and the statute it is charged with administering is indisputable. *Seattle Trust & Savings Bank v. Bank of California, N.A.,* 492 F.2d 48, 50 (9th Cir. 1974), citing *Udall v. Tallman,* 380 U.S. 1, 85 S.Ct. 792, 13 L.Ed.2d 616 (1965); *U. S. v. Consolidated Mines & Smelting Co., Ltd.,* 455 F.2d 432, 446 (9th Cir. 1971) ("[T]he ultimate criterion is the administrative interpretation, which becomes of controlling weight unless it is plainly erroneous or inconsistent with the regulation . . ."); *Ethyl Corp., supra,* 176 U.S.App.D.C. at 403 n.64, 541 F.2d at 31 n.64, citing *Train v. NRDC, Inc.,* 421 U.S. 60, 95 S.Ct. 1470, 43 L.Ed.2d 731 (1975). The agency's construction should not be overruled unless clearly wrong. *American Trucking Association, Inc. v. U. S.,* 425 F.Supp. 903, 907 (D.D.C.), *aff'd,* 425 U.S. 955, 96 S.Ct. 1735, 48 L.Ed.2d 201 (1975).

The critical inquiry is the degree of deference due the agency's interpretation. This turns on a number of factors. The principle of deference itself is premised on the twin notions of agency expertise and congressional acquiescence in that interpretation. *Wilderness Society v. Morton,* 156 U.S.App.D.C. 121, 145, 479 F.2d 842, 866 (en banc), *cert. denied,* 411 U.S. 917, 93 S.Ct. 1550, 36 L.Ed.2d 309 (1973); *Morton v. Ruiz,* 415 U.S. 199, 230, 94 S.Ct. 1055, 39 L.Ed.2d 270 (1974). In an oft-quoted passage from *Skidmore v. Swift & Co.,* 323 U.S. 134, 140, 65 S.Ct. 161, 164, 89 L.Ed. 124 (1944), the Court stated that the weight given an administrative decision "will depend upon the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control." Quoted in *Morton v. Ruiz, supra,* 415 U.S. at 237, 94 S.Ct. 1055; *Hodgson v. Consolidated Freightways, Inc.,* 503 F.2d 797, 800 (9th Cir. 1974).

The clearest cases for the reviewing court's taking a hard look at the agency's interpretation of a controlling statute or regulation arise where the agency action is challenged on the ground that (1) it exceeds the agency's statutory authority, *Seattle Trust & Savings Bank, supra,* 492 F.2d at 50, (2) its interpretation is contrary to the evident congressional intent manifested in the language of the statute (and supported by the legislative history), *Morton v. Ruiz, supra,* 415 U.S. at 237, 94 S.Ct. at 1075 ("In order for an agency interpretation to be granted deference, it must be consistent with the congressional purpose"); *N.L.R.B. v. Brown,* 380 U.S. 278, 291, 85 S.Ct. 980, 13 L.Ed.2d 839 (1965); *Hart v. McLucas,* 535 F.2d 516, 520 (9th Cir. 1976) ("[W]hen . . . the administrative construction is clearly contrary to the plain and sensible meaning of the regulation, the courts need not defer to it"), or (3) its action does not call for the application of any special or long-standing expertise, *Texas Gas Transmission Corp. v. Shell Oil Co.,* 363 U.S. 263, 268–69, 80 S.Ct. 1122, 4 L.Ed.2d 1208 (1960) (agency construction of private contract expressly based on application of "ordinary rules of contract construction").

█ The Supreme Court has also noted the difference between the deference to be accorded "legislative" regulations, which have "the force and effect of law," and "interpretive" regulations, to which a lesser deference is owed. *Batterton v. Francis,* 432 U.S. 416, 97 S.Ct. 2399, 2405 n.9, 53 L.Ed.2d 448 (1977). With respect to the former, where Congress has expressly delegated to the agency the power to promulgate regulations which interpret statutory terms, the arbitrary and capricious standard applies to the agency's regulations; but in the latter case, "[v]arying degrees of deference are accorded to administrative interpretations, based on such factors as the timing and consistency of the agency's position, and the general nature of its expertise. [Citations omitted.]" *Id.* In affirming an appellate court's denial of enforcement of

an N.L.R.B. order, the Court has stated, by way of limitation on the principle of deference to agency interpretations of applicable statutes:

> Reviewing courts are not obliged to stand aside and rubber-stamp their affirmance of administrative decisions that they deem inconsistent with a statutory mandate or that frustrate the congressional policy underlying a statute. . . . [W]here, as here, the review is not of a question of fact, but of a judgment as to the proper balance to be struck between conflicting interests, "[t]he deference owed to an expert tribunal cannot be allowed to slip into a judicial inertia which results in the unauthorized assumption by an agency of major policy decisions properly made by Congress." *American Ship Building Co. v. National Labor Relations Board*, 380 U.S. [300] at 318, 85 S.Ct. 955, 13 L.Ed.2d 855 . . . [(1965)].

*N.L.R.B. v. Brown, supra*, 380 U.S. at 291, 85 S.Ct. at 988 (1965). *See Hodgson, supra*, 503 F.2d at 800.

A somewhat special situation is presented where an agency charged with implementing a new statute construes it. Courts tend to be more deferential to practical administrative interpretations of disputed provisions of the governing statute in such a case.

> Particularly is this respect due when the administrative practice at stake "involves a contemporaneous construction of the statute by the men charged with the responsibility of setting its machinery in motion, of making the parts work efficiently and smoothly while they are yet untried and new." [Citation omitted.]

*Power Reactor Development Co. v. International Union, etc.*, 367 U.S. 396, 408, 81 S.Ct. 1529, 1535, 6 L.Ed.2d 924 (1961), quoted in *NRDC, Inc. v. Train*, 166 U.S.App.D.C. 312, 326, 510 F.2d 692, 706 (1975). In *Power Reactor* the Court upheld an order of the Atomic Energy Commission continuing in effect a provisional construction permit issued for a nuclear power reactor. In so holding the Court, in addition to the factor of contemporaneous construction noted above, emphasized the fact that the agency's interpretation had repeatedly been brought to the attention of Congress, thereby suggesting congressional acquiescence in the administrative construction. *Id.* In *Washington Public Power Supply System v. FPC*, 123 U.S.App.D.C. 209, 358 F.2d 840, *rev'd on other grounds*, 387 U.S. 428, 87 S.Ct. 1712, 18 L.Ed.2d 869 (1966), the court, after holding that where an agency must and does initially determine the specific application of a statutory provision the reviewing court is limited to deciding whether the agency interpretation "has 'warrant in the record' and a reasonable basis in law," *id.* 123 U.S.App.D.C. at 215, 358 F.2d at 846, quoted Mr. Justice Frankfurter's dissent in *I.C.C. v. J–T Transport*, 368 U.S. 81, 127, 82 S.Ct. 204, 234, 7 L.Ed.2d 147 (1961):

> The factors to be considered on judicial review of such an administrative determination include the precision of the statutory language, the technical complexity of the relevant issues, the need for certainty as against experimentation, and the likelihood that Congress foresaw the precise question at issue and desired to express a foreclosing judgment on it.

*See also Ethyl Corp., supra*, 176 U.S.App. D.C. at 403 n.64, 541 F.2d at 31 n.64; *NORML v. DEA*, 182 U.S.App.D.C. 114, 128 n.64, 559 F.2d 735, 749 n.64 (1977) ("[D]eference is owed to any agency decision construing a statute continually applied by the interpreting agency—particularly where the statutory meaning 'is enhanced by technical knowledge . . .' ").

The application of these principles to the facts of this case satisfies the Court that considerable deference is due the federal defendants' interpretation of their approval regulations. First, the Acting Administrator's approval has proceeded on the assumption that the regulations are clear; and consequently, he has not articulated in precise terms what he understands the regulations to mean or require or how the provisions of the CZMP satisfy the particular provisions of each applicable regulation. He has expressly stated which of the 1975

regulations he has considered with reference to each of the specific findings required under the CZMA in order for § 306 approval to be granted. However, to the extent his approval of the California Program can be said to be premised on interpretation of the NOAA regulations at all, his construction thereof proceeds *sub voce*; the fact that the CZMP has been found to meet their requirements is tantamount to little more than a statement that the provisions of the Program contain that which the regulations demand. No clearer interpretation has been forthcoming; and presumably, in the Acting Administrator's view, no clearer expression is here required. This makes judicial review difficult, to say the least, especially where the regulations on the whole have reference to fairly technical requirements, compliance with which the agency is in a far better position than the Court to assess.

Second, although NOAA has no longstanding experience and expertise in administering the CZMA, nevertheless, it appears (as will be discussed *infra*) that Congress placed responsibility for administering the CZMA in the Department of Commerce with the clear expectation that such responsibility ultimately would be delegated to NOAA, an agency favored by Congress expressly because of its technical expertise in matters relating to the Nation's coasts. Moreover, during enactment of the 1976 Amendments, Congress applauded NOAA's administration of the Act and directed it to promulgate regulations further clarifying the requirements of the Act (specifically § 306(c)(8)). In short, Congress, fully cognizant of the federal defendants' efforts and activities in administering the CZMA since 1972, apparently determined to reaffirm its original vesting of considerable discretion in NOAA, thereby calling into play the greater deference due "legislative" regulations noted above.

Third, as will be shown subsequently, the Court concludes that the interpretation evidenced by the Acting Administrator's approval of the CZMP is not contrary to, but rather consistent with, the evident congressional intent in this instance. Fourth, the

"special situation" alluded to where the agency is charged with implementing a new statute is here presented; and consequently greater deference is due.

Finally, the Court adheres to Mr. Justice Frankfurter's enumeration of factors to be considered and concludes that all four here favor according considerable deference to the federal defendants' implicit interpretation of the NOAA program approval regulations.

SCOPE OF REVIEW

From the inception of this lawsuit, the parties have been at odds over the issue of the permissible scope of review of the Acting Administrator's approval of the CZMP under § 306. Defendants have urged the Court to restrict its review to the administrative record before the Acting Administrator, to be supplemented only if necessary to explain the basis for his decision by affidavits or testimony of the Acting Administrator. Plaintiffs have argued that the Court consider additional evidence necessary to understand the record, to explain or clarify ambiguities therein, and to illuminate deficiencies in the environmental impact statement.

Both sides agree that any consideration of the appropriate scope of review must commence with *Overton Park* and *Camp v. Pitts, supra.* Under § 10 of APA, 5 U.S.C. § 706, review is to be based on "the whole record"; however, the statute does not define what is meant by this expression and case law construing it is scarce. Moreover, there is no statutory requirement, either under APA or the CZMA, that the record take a particular form.

 While judicial review is limited to the administrative record, if that record is inadequate to disclose the factors upon which the Acting Administrator's decision was based, the Court may require additional "explanation" by way of affidavits or testimony from the responsible official(s) or remand to the agency for formal findings. *Overton Park, supra,* 401 U.S. at 419–20, 91 S.Ct. 814; *Camp v. Pitts, supra,* 411 U.S. at

142–43, 93 S.Ct. 1241. To be sure, "inquiry into the mental processes of the administrative decision-makers is usually to be avoided. [Citation omitted.] And where there are administrative findings that were made at the same time as the decision, . . . there must be a strong showing of bad faith or improper behavior before such inquiry may be made." 401 U.S. at 420, 91 S.Ct. at 825. The Court was even more explicit in *Camp*:

> Unlike *Overton Park*, in the present case there was contemporaneous explanation of the agency decision. . . . The validity of the [agency's] action must, therefore, stand or fall on the propriety of that finding . . . . If that finding is not sustainable on the administrative record made, then the . . . decision must be vacated . . . and the matter remanded . . . for further consideration.

411 U.S. at 143, 93 S.Ct. at 1244.

At first blush the present action appears to be more closely assimilable to the pattern in *Overton Park* — the Acting Administrator's findings, while technically made contemporaneously with his approval of the CZMP, obviously could not avoid taking into account plaintiffs' claims asserted in this law suit (filed two months earlier). Further scrutiny, however, requires classification, if at all, in the category of action represented by *Camp v. Pitts*. The *Overton Park* court noted that in a case where the agency decision issued unaccompanied by any statement of reasons, any explanation following upon the heels of an action seeking review of that decision would likely take on the aspect of "litigation affidavits." "These affidavits [are] merely '*post hoc*' rationalizations [citation omitted] which have traditionally been found to be an inadequate basis for review." 401 U.S. at 419, 91 S.Ct. at 825. Recognizing the potential problem presented by a district court having to inquire into the mental processes of the responsible officials, the Court cautioned:

It may be that the Secretary can prepare formal findings . . . that will provide an adequate explanation for his action. Such an explanation will, to some extent, be a '*post hoc* rationalization' and thus must be viewed critically. If the District Court decides that additional explanation is necessary, that court should consider which method will prove the most expeditious so that full review may be had as soon as possible.

*Id.*

No "additional explanation" is here required—nor is there need to view the Acting Administrator's November 7, 1977 findings as critically as those of the Secretary of Transportation in *Overton Park*. This is so because: (1) when the Acting Administrator had communicated to plaintiffs on September 8th his determination to approve the CZMP under § 306, plaintiffs sought and this Court issued a temporary restraining order preventing the Acting Administrator from formal effectuation of his approval; and (2) no strong showing of bad faith or improper behavior on the part of the responsible officials has been presented. (This is not to disregard the sweeping allegation that the environmental review process was a sham undertaking to window dress a determination to approve the CZMP before the NEPA review was ever commenced.) [8]

As regards the agency's production of the "whole record" in this Court, plaintiffs, pursuant to the October 7, 1977 order, submitted the evidence they urged the Court to consider. This evidence included, among other things, affidavits of plaintiffs' agents and employees seeking to establish irreparable harm and affidavits of various experts seeking to demonstrate the inadequacy both of the CZMP and the FEIS. It also included documentary evidence which plaintiffs asserted either was or should have been before the Acting Administrator at the time of his approval of the CZMP, and thus included in the administrative record laid before the Court by the federal defendants.

---

8. Plaintiffs' reference to the fact that in issuing the DEIS and RDEIS the federal defendants

indicated a tentative decision to approve is unpersuasive.

Among the alleged deficiencies are federal defendants' failure to include the following documents or groups of documents:

(1) the Biennial Report to the Legislature of the California Energy Commission, Volumes 4 and 7 (May 1977);

(2) permit decisions of the California Coastal Commission and various regional commissions (which the state defendant has stated constitute precedents under the Coastal Act);

(3) certain papers prepared by the Governor's Office of Planning and Research;

(4) correspondence between the Coastal Commission and federal defendants;

(5) the California Coastal Commission "Meeting Notice" and "Agenda" for July 19–20, 1977;

(6) a memorandum from the Coastal Commission's Executive Director to the Commissioners (July 11, 1977);

(7) "Threshold Papers" (prepared by the staff at OCZM, which set forth certain "minimum requirements" which any program submitted for § 306 approval was required to satisfy) (December 8, 1975 and May 24, 1976);

(8) NOAA Proposed Program Approval (§ 306) Regulations, 15 C.F.R. Part 923, 42 Fed.Reg. 43552 (August 29, 1977);

(9) NOAA Proposed Consistency (§ 307) Regulations, 15 C.F.R. Part 930, 42 Fed.Reg. 43586 (August 29, 1977);

(10) affidavits prepared by plaintiffs in connection with the filing of this lawsuit and plaintiffs' motions for preliminary relief [9]; and

(11) interrogatories from plaintiffs to federal defendants and the state defendant, and defendants' responses thereto (October 14, 1977).

Defendants objected generally to the receipt in evidence of the above on the grounds that consideration by the Court of plaintiffs' evidence would contravene the scope of review to which the Court must adhere under *Overton Park* and *Camp v. Pitts* and that plaintiffs had the opportunity to submit such evidence to the agency during the review process. This last objection appears directed more at plaintiffs' expert testimony than at documents which plaintiffs assert were or, because of their notoriety and obvious importance, should have been before the Acting Administrator. To the extent it is directed at documents which were allegedly in the federal defendants' files, defendants' latter objection must be viewed as tantamount to an assertion that those challenging informal agency action have the burden of assuring that the agency considers its own records and documents. Certainly no such burden exists. *See County of Suffolk v. Secretary of Interior*, 562 F.2d 1368, 1385 (2d Cir.), *cert. denied*, 434 U.S. 1064, 98 S.Ct. 1238, 55 L.Ed.2d 764 (1978).

If the Court is to discharge its responsibility under APA, the "whole record" which was before the agency must be produced:

. . . [T]he law requires production of the entire administrative record. . . . While there may be instances in which the entire record need not be filed, where the correctness of factual findings are involved or where complainants request the full record, . . . the agency must produce it in court.

*Silva v. Lynn*, 482 F.2d 1282, 1283 n.1 (1st Cir. 1973) (HUD decision to assist in a housing project); *NRDC, Inc. v. Train*, 171 U.S. App.D.C. 151, 155, 519 F.2d 287, 291 (1975); *Overton Park, supra*, 401 U.S. at 419–20, 91 S.Ct. 814.

This principle similarly demonstrates that defendants' first ground of objection—that receipt of such evidence by the Court would

---

**9.** The Court naturally has received these in connection with plaintiffs' motion for preliminary relief, but concludes that they do not constitute part of the administrative record. "The book has to be closed at some point in time." *Silva v. Lynn*, 482 F.2d 1282, 1286 n.5 (1st Cir.

1973). Plaintiffs had been given ample opportunity to present and submit comments to the Acting Administrator. They had done so. No reason appears why the fact of their filing an action should extend the period during which the agency was required to accept comments.

violate the limited scope of review mandated by APA—begs the question, namely, what constitutes the "whole record" in this instance?

During the February hearings, the Court tentatively admitted all plaintiffs' evidence, reserving a final ruling as to its admissibility (and for what purpose) pending plaintiffs' submission of a document setting forth the issues as to which the evidence was offered. That document having been received, the Court has determined to consider and has considered plaintiffs' proffered evidence for the purpose, unless otherwise indicated, of determining whether the federal defendants considered and/or lodged with the Court all that they should have during the review process and, if not, whether their failure so to do infected their decision to grant final approval to the CZMP to such a degree as to require this Court's vacating it and remanding the matter for further consideration.

▆ Whether certain evidence be deemed part of the "whole record" or not, the Court notes that where (as here) the adequacy of the environmental impact statement is challenged, evidence pertinent thereto is admissible, not subject to the stricter constraints to which the receipt of other evidence (admittedly not part of the administrative record) is subject. *County of Suffolk, supra.* As the Second Circuit explained, with reference to the district court's receipt of evidence outside the administrative record in another challenge to the adequacy of an EIS:

> *Nor was the court obliged to restrict its review to the administrative record.* Although the focus of judicial inquiry in the ordinary suit challenging nonadjudicatory, nonrulemaking agency action is whether, *given the information available to the decision-maker at the time,* his decision was arbitrary or capricious, and for this purpose "the focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court", *Camp v. Pitts,* 411 U.S. 138, 142, 93 S.Ct. 1241, 1244, 36 L.Ed.2d 106 (1973),

in NEPA cases, by contrast, a primary function of the court is to insure that the information available to the decision-maker includes an adequate discussion of environmental effects and alternatives, *Natural Resources Defense Council, Inc. v. Callaway,* 524 F.2d 79, 90–94 (2d Cir. 1975); *Greene County Planning Board v. FPC,* 455 F.2d 412, 419–20 (2d Cir. 1972), which can sometimes be determined only looking outside the administrative record to see what the agency may have ignored.

*A suit under NEPA challenges the adequacy of part of the administrative record itself—the EIS.* Glaring sins of omission may be evident on the face of the statement. [Citations omitted.] Other defects may become apparent when the statement is compared with different parts of the administrative record. [Citations omitted.] Generally, however, allegations that an EIS has neglected to mention a serious environmental consequence, failed adequately to discuss some reasonable alternative, or otherwise swept "stubborn problems or serious criticism . . . under the rug," *Silva v. Lynn,* 482 F.2d at 1285, raise issues sufficiently important to permit the introduction of new evidence in the district court, including expert testimony with respect to technical matters, both in challenges to the sufficiency of an environmental impact statement and in suits attacking an agency determination that no such statement is necessary.

*Id.* at 1384–85 (first and third emphases supplied; second emphasis original). *See Cady v. Morton,* 527 F.2d 786, 796 (9th Cir. 1975); *Friends of the Earth v. Coleman,* 513 F.2d 295, 300 & n.6 (9th Cir. 1975); *Trout Unlimited v. Morton,* 509 F.2d 1276, 1281, 1284 (9th Cir. 1974); *Life of the Land v. Brinegar,* 485 F.2d 460, 463, 469–73 (9th Cir. 1973), *cert. denied,* 416 U.S. 961, 94 S.Ct. 1979, 40 L.Ed.2d 312 (1974). As previously noted, plaintiffs have lodged such expert testimony, and the Court has received it.

Plaintiffs have complained that the agency review of the CZMP was fatally infected by the agency's application of the January

1975 § 306 regulations. Plaintiffs suggest that at least in some respects (and particularly with regard to § 306(c)(8)), these regulations fail to take account of the 1976 Amendments to the Act and suggest that the CZMP should have been tested against the proposed regulations instead.[10] The federal defendants, to the contrary, argue that the CZMP must be tested by reference to the regulations in effect at the time it was developed and submitted to OCZM, that the 1976 Amendments worked no major changes in the approval requirements, and that, in any event, the CZMP meets all requirements of the CZMA, as amended.

The Court looks to the proposed and interim final regulations for the limited purpose of determining how the agency's views of the requirements of the CZMA may have changed in light of its experience in administering the CZMA and in light of the 1976 Amendments. To the extent that changes have been substantial and to the extent that the CZMP appears not to qualify for approval under the later regulations, the evidence is relevant to the issue of whether approval in late 1977 at the very time the new regulations were published in proposed form constituted an abuse of discretion.

## ADOPTION BY THE STATE

On its face the record produced by the federal defendants establishes that the CZMP was "adopted by the state" within the meaning of CZMA § 306(c)(1). In pertinent part this section provides:

(c) Prior to granting approval of a management program submitted by a coastal state, the Secretary shall find that:

(1) The state has developed and adopted a management program for its coastal zone in accordance with rules and regulations promulgated by the Secretary . . .

The regulation which covers this requirement of § 306(c)(1) is 15 C.F.R. § 923.31, which provides that "(a) . . . the management program must show evidence that: (1) The management program has been formally adopted in accordance with State law, or in its absence, administrative regulations; . . . ." Subsection (b)(1) amplifies the agency's interpretation of this requirement:

The management program must demonstrate that it represents the official policy and objectives of the State. In general, this will require documentation in the management program that the State management entity has formally adopted the management program in accordance with either the rules and procedures established by statute or, in the absence of such law, administrative regulations.

This presents no problem as to the first four of the five "elements" of which the Acting Administrator stated the CZMP consists: (1) the Coastal Act of 1976 (which he characterized as comprising "the core element" of the Program); (2) the Coastal Conservancy Act of 1976; (3) the Urban and Coastal Park Bond Act of 1976; (4) Coastal Commission Regulations promulgated pursuant to the Coastal Act of 1976; and (5) the "Program Description" (contained in Part II of the combined *State of California Coastal Management Program and Final Environmental Impact Statement* ("FEIS").[11] Approval of the California Coastal Management Program (November 7, 1977) ("Findings") at 3.

It is with respect to the status of this last element—the Program Description—that the Court has from the inception of this litigation found difficulty. Plaintiffs assert that the Program Description was prepared by Coastal Commission staff and that the record contains no evidence of its ever having been reviewed, much less formally

---

10. The proposed regulations have since been replaced by "interim final" regulations. 43 Fed.Reg. 8378 (March 1, 1978).

11. *See supra* note 3. This Program Description embraces the Introduction and Chapters 1 through 14 of Part II of what has heretofore

been referred to simply as the FEIS. The only additional matter contained in Part II is a transmittal letter from the Governor of California to NOAA indicating that he has reviewed the CZMP and approves it, in accordance with the requirement of § 306(c)(4).

adopted, by the Coastal Commission itself, even assuming that formal adoption by such would constitute "formal adoption by the State." Apparently only Chapter 11 was approved by the Coastal Commission, but plaintiffs contend that the approval was without notice and opportunity for public participation required not only by the CZMA but by the California Open Meeting Act (Cal.Gov.Code §§ 11120 *et seq.*).

The Introduction to Part II (the Program Description) of the FEIS states:

> Part II of this document is a narrative description of the legislative and administrative measures embodied in the C[Z]MP, organized to correspond to the specific requirements of the Coastal Zone Management Act of 1972, as amended. As such, the bulk of Part II is explanatory, descriptive, historical, and interpretative in nature. Chapter 11 is quite different in that it is a definitive policy statement adopted by the Coastal Commission. Chapter 11 explains how national considerations were addressed in the development of the C[Z]MP, illustrates how Federal agencies were involved in California's coastal planning, and outlines a general approach for implementing the Federal Consistency provisions of Section 307 of the CZMA in California. Several public hearings have been held on this material as it has evolved over the past two years.

FEIS at 15.[12]

Turning first to plaintiffs' charge that Chapter 11 was improperly adopted by the Coastal Commission, the Court notes that § 11125 of the California Government Code provides:

> (a) The state agency shall prepare an agenda for, and provide notice of, its meeting to any person who requests such notice in writing. Notice shall be given at least one week in advance of and shall include the agenda for the meeting . . . .
>
> (b) Notice shall include the items of business to be transacted, and no item shall be added to the agenda subsequent to the provisions of such notice, absent unforeseen emergency conditions . . . . .
>
> (c) A person may request, and shall be provided, notice pursuant to subdivision (a) for all meetings of the agency or only for a specific meeting or meetings. . .

Section 11125.1 provides:

> (a) Notwithstanding any other provision of this chapter, agendas of public meetings and copies of public documents, or summaries thereof, which are to be discussed or considered at a public meeting of a state agency shall be made available to the public by the state agency prior to the commencement of such meeting . . . . .

Plaintiffs have failed to allege that they requested notice of the July 19–20, 1977 meeting of the Coastal Commission at which Chapter 11 was formally adopted, either specifically or as part of an ongoing request for notice of "all meetings" under § 11125(c). Nor have plaintiffs alleged that copies of revised Chapter 11 were unavailable to the public prior to the meeting under § 11125.1(a). Nevertheless, plaintiffs have submitted an undated "Meeting Notice" and "Tentative Agenda" for those meetings. That notice omits any reference to presentation of Chapter 11 for action thereon by the Commission, although a July 11, 1977 memo to the Commissioners from Joseph E. Bodovitz, Executive Director of the Commission, submits the revised Chapter 11 and notes that it is to be considered by the

---

**12.** One substantive change wrought by revised Chapter 11 is described by the staff of the OCZM in their response to comments received on the RDEIS:

> Based on comments received on the draft, Chapter 11 . . . reflects a change in the Commission's earlier intention to delegate the Federal consistency decisions to local units of government after approval of local coastal programs. This change in policy—to maintain consistency determinations at the state level subject to review and comment by affected local, state, and federal agencies and interested groups—will assure that these decisions will reflect continuing statewide, regional, and national interests in the decisions. FEIS, Attachment J at J–4.

**914**

Commission at the July 19–20 meeting. Thus, although on the record before the Court plaintiffs lack standing to complain of a violation of § 11125(a), it would appear that a violation of §§ 11125.1(a) and 11125(b) may have occurred.

 Even assuming such to be the case, the question remains whether this Court can grant plaintiffs the relief they seek—to wit, treating Chapter 11 as a nullity for purposes of reviewing the Acting Administrator's finding that the CZMP includes Chapter 11 of Part II of the FEIS and that Chapter 11 was formally adopted by the state within the meaning of § 306(c)(1) and 15 C.F.R. § 923.31. Section 11130, the only provision of the Open Meeting Act (Article 9 of Chapter 1 of Part 1 of Division 3 of the Government Code) which addresses the subject of relief for violations of that act, provides:

> Any interested person may commence an action by mandamus, injunction, or declaratory relief for the purpose of stopping or preventing violations or threatened violations of this article or to determine the applicability of this article to actions or threatened future actions by members of the state agency.

The remedial section looks to present and prospective violations; it is silent with respect to what relief, if any, is available for past violations of §§ 11125(b) and 11125.-1(a). The parties have not addressed the issue and the Court, in reviewing what little case law has been reported under Article 9 and in reviewing the other provisions of Part 1 of Division 3 (dealing with "State Departments and Agencies" within the "Executive Department") has found no authority for plaintiffs' assault on the validity of the Commission's adoption of Chapter 11 as a "declaration of policy." [13] The few

cases that have arisen under § 11130 and the Open Meeting Act generally have involved plaintiffs' seeking present or prospective relief; none has sought to overturn action for violation of the notice and agenda provisions of §§ 11125 and 11125.1. *See, e. g., California State Employees Association v. State Personnel Bd.,* 31 Cal.App.3d 1009, 108 Cal.Rptr. 57 (3d Dist.1973); *Harmer v. Superior Court,* 275 Cal.App.2d 345, 79 Cal.Rptr. 855 (3d Dist.1969). In possibly the most closely analogous situation—that of a challenge to the validity of regulations—the California statute expressly provides for declaratory relief following the promulgation of the regulation (Cal. Gov.Code § 11440), but conditions judicial relief on a finding of "substantial failure to comply with the provisions of this chapter [4.5]." The adoption of Chapter 11 has not been challenged on this ground; rather, the sole ground of attack has been alleged failure to comply with Article 9 of Chapter 1. The Court rejects this ground of attack, finding that plaintiffs have failed to show either their entitlement to receive notice of the July 19–20 meeting (and the agenda thereof), unavailability of Chapter 11 prior to the meeting, or, assuming a violation of the Open Meeting Act by omitting to include action on Chapter 11 in the agenda, authority for the relief they seek. The Court notes, finally, that the revisions to Chapter 11, which first appeared in the RDEIS, were largely a response to comments received by the Coastal Commission and the federal defendants from plaintiffs and other interested persons and agencies. In short, the policies sought to be furthered by the Open Meeting Act and by CZMA § 306(c)(1) and (3) have here been effectuated. Plaintiffs' position with respect to the California Program, and in particular with

---

**13.** Plaintiffs have nowhere asserted (nor does the Court now raise *sua sponte* the issue) that adoption of Chapter 11 by the Coastal Commission constituted adoption of a "regulation" within the meaning of Government Code § 11371(b), thereby raising issues of validity under §§ 11374 and 11420 *et seq.* The latter provisions deal with the procedure for the adoption of regulations. The Court notes, by way of analogy to the present issue, that under

§ 11423, which requires notice of any proposed adoption, amendment, or repeal of a regulation, "[t]he failure to mail notice to any person as provided in this section shall not invalidate any action taken by a state agency pursuant to this article." Adoption of Chapter 11 under Article 9 presumably is subject to even less restrictive remedial measures than adoption of regulations under the above provisions.

respect to its alleged failure to comply with § 306(c)(8), has been presented both to the Coastal Commission and to the federal defendants.

The determination that Chapter 11 was duly adopted and thus properly considered by the Acting Administrator in examining the California Program under § 306 does not end the inquiry, for there remains the problem of the status of the remainder of Part II. The Acting Administrator, in making his findings pursuant to § 306(c)(1), stated:

> The essential elements of the California Coastal [Zone] Management Program— the Coastal Act, the Coastal Conservancy Act, and the Urban and Coastal Park Bond Act—which give the Program its enforceability have been formally adopted in accordance with State law.

Findings at 13. This apparent vacillation between the three statutory components of the CZMP and the five "elements" noted in the Findings at 3—this distinction between "elements" and "essential elements"—is confusing and unfortunate. While Chapter 11 has been formally adopted by the Coastal Commission, the remaining chapters of the Program Description were prepared by the Commission staff and apparently never presented to, much less acted upon, by the Commission itself.

As noted previously, in the Introduction to Part II of the FEIS, the Program Description (other than Chapter 11) is characterized as "a narrative description of the legislative and administrative measures embodied in the C[Z]MP, organized to correspond to the specific requirements of the Coastal Zone Management Act of 1972, as amended. As such, the bulk of Part II is explanatory, descriptive, historical, and interpretive in nature." FEIS at 15.

The Court has reviewed the Program Description and concurs in the view that its contents are primarily descriptive; it does not, except as previously noted with respect to Chapter 11, expand or amend or revise the Program embodied in the Coastal Act, the two companion pieces of legislation, and the duly adopted Coastal Commission regulations. Chapter 9, dealing with the addition of paragraphs (7), (8), and (9) to § 305(b) by the 1976 Amendments to the CZMA, in essence merely describes, through references to specific provisions of the Coastal Act, how the California Program satisfies these recently added requirements of the CZMA.[14] As such, the Court concludes that formal adoption by the Commission was unnecessary.

At the same time, however, the Court has difficulty in considering these chapters as part of the Program itself. They appear rather to be a device, an organizational tool,

---

14. A management program submitted for § 306 approval need not satisfy the requirements of § 305(b)(7)–(9) before October 1, 1978. The Acting Administrator, however, has found the CZMP to satisfy these requirements in its present form.

Although in its response to comments received on the draft program and environmental impact statement regarding the national interest in siting facilities, the staff of the OCZM stated that the California Program has been "expanded to describe, in more detail, the energy facility planning and siting process (Chapter 9)", the Court's review of Chapter 9 reveals that "expand" was an unfortunate choice of words. Chapter 9, unlike Chapter 11, does not rise to the dignity of a declaration of policy; it does not modify or reverse previously announced Commission policies or procedures. The vast bulk of the chapter quotes or paraphrases sections of the Coastal Act to demonstrate how the California Program meets the requirements of § 305(b)(7)–(9). Although it includes a description of the "Steps of the Energy Facility Planning Process" (FEIS at 66–67), a recital of with whom the Commission consults and what information (from which sources) it considers, and an identification of other agencies involved in the process (FEIS at 70–71) and energy facilities likely to affect the coast (FEIS at 72–73), these statements do not represent changes in policy or procedure. They embody the suggestions contained in the proposed (now interim final) national interest regulation regarding sources of relevant information which specify the national interests to be considered (15 C.F.R. § 923.52(f) and (g)). The chapter is primarily descriptive. The Court concludes that while formal adoption by the Coastal Commission of Part II would have been a preferable procedure in this case, failure to do so is not fatal to the Acting Administrator's approval, even as respects Chapter 9.

to enable interested parties and the Acting Administrator to see more easily how the specific requirements of § 306 have been dealt with and satisfied. The need for such a description stems from the fact that the California Legislature, in establishing its management program under a new federal statute, obviously did not track the provisions of the CZMA. Consequently, there is no one provision of the California Program—more specifically, the Coastal Act of 1976—which, for instance, sets forth "a definition of what shall constitute permissible land uses and water uses" (§ 305(b)(2)) or "a planning process for energy facilities" (§ 305(b)(8)) or any of the other substantive items which a program must contain in order to receive § 306 approval. Rather, whether the Program contains that which the CZMA requires must be gleaned from a broader perspective, with a view to envisioning what the Program addresses and accomplishes and what standards, mechanisms, and procedures it establishes. This is particularly true of those findings which the Acting Administrator must make respecting whether the Program, for example, establishes "an effective mechanism for continuing consultation and coordination" (§ 306(c)(2)(B)) or provides for "adequate consideration of the national interest" (§ 306(c)(8)) or provides a "method of assuring that local land and water use regulations . . . do not unreasonably restrict or exclude land and water uses of regional benefit" (§ 306(e)(2)).

This the Acting Administrator has done, and his use of the Program Description for this purpose cannot be faulted. That he in fact so used the Program Description is suggested by his caveat to the findings issued with his approval:

The findings herein should be understood to represent only a summary of how [the California Program] meets the requirements [of the CZMA]. Complete and detailed documentation is contained in the Combined California Coastal Management Program and NOAA Final Environmental Impact Statement (FEIS) and in Attachments by Reference which were submitted to NOAA in further substantiation of meeting all CZMA requirements. These documents are referenced in the findings that follow as appropriate.[7]

Findings at 3. Footnote 7 states: "References to the California Program may be found in Part II of the FEIS. . . ." This last suggests that the Acting Administrator himself recognized that strictly speaking, a "program description" cannot be part of the program any more than a person's shadow can be said to be part of that person.

Recognition of the need for establishing a clearer format for the submission of management programs for § 306 approval—perhaps prompted by NOAA's experience in the California case—is evidenced by NOAA's "interim final" regulations (43 Fed.Reg. 8378, March 1, 1978), which, effective April 1, 1978, supersede the approval regulations against which the California Program was tested. New § 923.71 ("Recommended format for program submissions") provides guidance in response to requests from a number of states for a "suggested format." The regulation includes such a format, noting that such is not mandatory so long as the state's program addresses all the sections of the CZMA and associated regulations. *See also* 15 C.F.R. § 923.1(f). In subsection (b) NOAA suggests that

States should include an index with their program submission that indicates where in the management program document the information can be found which is necessary to make the findings required by the Act and associated regulations.

Section 923.71(b) also provides a chart which lists the findings required by the Act and the associated regulations, and suggests that if states choose to utilize the chart as an index, they should add a third column listing the page numbers (or provisions) of the program document in which the requisite information can be found. Subsection (c) provides a recital of the suggested format.

There can be no doubt that had such a suggested format been in existence at the

time of the submission of the California Program (assuming California had followed it), judicial review (and presumably administrative review) would have been greatly simplified. It may not be overstating the matter to say that many if not most of the issues raised by plaintiffs might have been eliminated or at least far more sharply focused.

Congress in enacting and amending the CZMA did not specify any particular form which management programs assume; nor for that matter did it specify the form or manner in which a program fulfill the requirements of § 305(b). Wisely or unwisely, it left the details to the Department of Commerce and the states. In this instance, California has chosen to organize its Coastal Act in a manner which requires the Acting Administrator and the Court in essence to reconstruct the Program in light of the § 306 approval requirements in much the same manner one might attempt to assemble a jigsaw puzzle. As unwieldy and unwelcome a task as this has been, the Court cannot say that the federal defendants' willingness to undertake it in order to evaluate the CZMP under § 306 is arbitrary or capricious. While the Court, had it been presented with such a program for initial review, might well have returned it to the Coastal Commission for indexing along the lines suggested in 15 C.F.R. § 923.71, the Court recognizes that it may not substitute its judgment for that of the Acting Administrator. The statute is silent on these matters; they have been left to the agency's discretion; and the agency has exercised its discretion in a nonarbitrary manner.

■ The Court notes, finally, with respect to what is and is not to be deemed part of a state's management program, that the regulation above-cited implicitly recognizes that "formal adoption by the state" is not required for the form of submission, although it presumably remains a requirement in some form. The current interim final program approval regulations do not contain the equivalent of 15 C.F.R. § 923.31 of the regulations existing at the time of the Acting Administrator's approval of the CZMP. That regulation, it will be recalled, required that the program be "formally adopted in accordance with State law, or, in its absence, administrative regulations." The regulation had as its source § 306(c)(1). The present regulations make no reference whatever to "formal [or any other] adoption by the state." The regulations associated with § 306(c)(1)—15 C.F.R. §§ 923.3, 923.51, 923.55, and 923.58—focus on general requirements, federal-state consultation, full participation, and public hearings. No mention of state adoption in any particular manner or with any specific formality is made. Section 923.71(c), in suggesting the format such program submissions for § 306 approval should take, "recommends the following items as appendixes: . . . Text of Relevant Legal Authorities. . . . " In short, under the revised program approval regulations, a form of program developed by the state agency authorized to manage that state's coastal zone presumably would suffice, provided that there is some legal basis for that agency's establishing such a form of program. The matter appears most confused at this time inasmuch as the NOAA regulations fail entirely to address the issue. For present purposes, nonetheless, the Court in applying the then-existing regulation (15 C.F.R. § 923.31) concludes that those chapters of Part II of the FEIS (the Program Description) which merely describe and organize that which is already contained in the other four "elements" of the California Program are not in themselves the Program but were properly considered by the Acting Administrator in his review of the Program.[15] The Court need

---

15. The Coastal Act (Cal.Pub.Res.Code) § 30330 contains a broad grant of authority to the Coastal Commission as "the state coastal zone planning and management agency for any and all purposes, [which] may exercise any and all powers set forth in the [CZMA]." Section 30009 provides that the Coastal Act "shall be liberally construed to accomplish its purposes and objectives." There is thus authority for the Commission's adoption of Chapter 11 as well as authority for its staff's preparing the Program Description for purposes of organizing the California Program along § 306 approval lines for the convenience of the Acting Administrator and the public.

not remand to the Acting Administrator to obtain his approval based on a review of just the other four "elements," since he appears to have understood the function of the Program Description, and since (with the exception of the formally adopted Chapter 11) the Program Description does not alter or amend the Coastal Act or related authorities, and since his utilization of Part II was not improper.

LEGISLATIVE HISTORY OF THE CZMA

A seemingly unbridgeable gulf between the parties concerning the proper construction of the CZMA establishes the cutting edge of this action. First, noted at the outset of this memorandum of decision, plaintiffs complain that the California Program fails to qualify for final approval under § 306 because it lacks the requisite specificity Congress intended management programs to embody, especially with respect to the substantive requirements of §§ 305(b) and 306(c), (d), and (e), so as to enable private users in the coastal zone subject to an approved program to be able to predict with reasonable certainty whether or not their proposed activities will be found to be "consistent" with the program under § 307(c). Second, plaintiffs contend that a proper understanding of § 306(c)(8), particularly in light of the 1976 Amendments, compels the conclusion that in requiring "adequate consideration" Congress intended that an approvable program affirmatively accommodate the national interest in planning for and siting energy facilities and that the CZMP fails so to do. The Court here addresses each of these contentions.

A. *The Definition of "Management Program."*

Any attempt to resolve this underlying dispute, out of which most of the issues in this lawsuit arise, must begin with Congress' definition of a "management program" in § 304(11) of the Act:

The term "management program" includes, but is not limited to, a comprehensive statement in words, maps, illustrations, and other media of communication, prepared and adopted by the state in accordance with the provisions of this title, setting forth *objectives, policies and standards to guide* public and private uses of lands and waters in the coastal zone.

(Emphasis supplied.) This definition is exactly as originally contained in the Senate version of the CZMA (S.3507). In its report on S.3507, the Committee on Commerce stated:

"Management program" is the term to refer to the *process* by which a coastal State . . . proposes . . . to manage land and water uses in the coastal zone so as to reduce or minimize a direct, significant, and adverse effect upon those waters, including the development of criteria and of the governmental structure capable of implementing such a program. In adopting the term "Management program" the Committee seeks to convey the importance of a *dynamic* quality to the planning undertaken in this Act that permits adjustments as more knowledge is gained, as new technology develops, and as social aspirations are more clearly defined. The Committee does *not* intend to provide for management programs that are *static* but rather to create a *mechanism for continuing review* of coastal zone programs on a regular basis and to provide a framework for the allocation of resources that are available to carry out these programs.

S.Rep.No.92–753, 92d Cong., 2d Sess. (1972), U.S.Code Cong. & Admin.News 1972, pp. 4776, 4784, reprinted in Senate Committee on Commerce, Legislative History of the CZMA 201–02 (Comm. Print 1976) ("Legislative History") (emphases supplied).[16] The House version (H.R. 14146) did not contain a definition of "management program" and the Conference Report (H.Rep.No.92–1544,

---

16. Hereafter parallel citations will be given to both the congressional report and the Legislative History (wherein the report may be found).

92d Cong., 2d Sess. (1972) (Legislative History at 443f)) failed to add anything further to the above explanation.

 The Court agrees with defendants that Congress never intended that to be approvable under § 306 a management program must provide a "zoning map" which would inflexibly commit the state in advance of receiving specific proposals to permitting particular activities in specific areas. Nor did Congress intend by using the language of "objectives, policies, and standards" to require that such programs establish such detailed criteria that private users be able to rely on them as predictive devices for determining the fate of projects without interaction between the relevant state agencies and the user. To satisfy the definition in the Act, a program need only contain standards of sufficient specificity "to guide public and private uses."

The CZMA was enacted primarily with a view to encouraging the coastal states to plan for the management, development, preservation, and restoration of their coastal zones by establishing rational processes by which to regulate uses therein. Although sensitive to balancing competing interests, it was first and foremost a statute directed to and solicitous of environmental concerns. See §§ 302 and 303. "The key to more effective use of the coastal zone in the future is introduction of management systems permitting conscious and informed choices among the various alternatives. The aim of this legislation is to assist in this very critical goal." S.Rep.No.92–753, U.S. Code Cong. & Admin.News 1972, p. 4781

(Legislative History at 198). See H.Rep.No. 92–1049, 92d Cong., 2d Sess. (1972) (Legislative History at 313 and 315).

The Amendments of 1976 made clear the national interest in the planning for, and siting of, energy facilities (to be discussed infra). Apparently neither the Act nor the Amendments thereto altered the primary focus of the legislation: the need for a rational planning process to enable the state, not private users of the coastal zone, to be able to make "hard choices." "If those choices are to be rational and devised in such a way as to preserve future options, the program must be established to provide guidelines which will enable the selection of those choices." H.Rep. No. 92–1049 (Legislative History at 315). The 1976 Amendments do not require increased specificity with regard to the standards and objectives contained in a management program. (Specificity as it relates to § 306(c)(8) will be discussed infra.)

In conclusion, to the extent plaintiffs' more specific challenges to the Acting Administrator's § 306 approval are premised on an interpretation of congressional intent to require that such programs include detailed criteria establishing a sufficiently high degree of predictability to enable a private user of the coastal zone to say with certainty that a given project must be deemed "consistent" therewith, the Court rejects plaintiffs' contention.[17]

Section 306(a)(1) requires the Secretary, prior to approval of a management program under § 306, find that it contains that

---

**17.** The interim final program approval regulations (43 Fed.Reg. 8378, March 1, 1978), to be sure, require that the policies contained in a management program be "specific, comprehensive and enforceable, and . . . provide an adequate degree of predictability as to how coastal resources will be managed." 15 C.F.R. § 923.1(c)(2). They do not require near certainty as to what particular decisions will emerge. Among the general requirements for approvability under § 306 is that of 15 C.F.R. § 923.-3(a)(2):

That the policies, standards, objectives and criteria upon which decisions pursuant to the program will be based are articulated clearly and are sufficiently specific to provide (i) a

clear understanding of the content of the program, especially in identifying who will be affected by the program and how, and (ii) a clear sense of direction and predictability for decision makers who must take action pursuant to or consistent with the management program. . . .

Subsection (h) clarifies the above requirement in noting the distinction between policies that are of an enforceable nature and those that are of an "enhancement" (or horatory) nature, and provides examples of each which demonstrate that the approach embraced by the California Program satisfies the specificity requirements of the latest as well as the then-existing regulations.

which § 305(b) specifies. Plaintiffs have focused their attack in large measure on what they charge is the CZMP's failure to include those items which § 305(b) mandates, especially those required by paragraphs (2), (3), and (5) thereof. The attack is premised not on any alleged invalidity of or ambiguity in NOAA's regulations (15 C.F.R. Parts 920 and 923)—although plaintiffs insist the proposed (now interim final) program approval regulations (Part 923), rather than the then-existing regulations, should have been utilized in evaluating the California Program—but rather on the alleged failure of the Acting Administrator properly to apply the regulations to the CZMP.

The Court has reviewed the Acting Administrator's findings, the CZMA, and the regulations (both then-existing, proposed, and now interim final), and concludes that the Acting Administrator's finding that the Program satisfies the requirements of § 305(b) (as required by § 306(a)(1)) was not arbitrary or capricious, and further, that his application of the then-existing regulations (published January 9, 1975) was not an abuse of discretion or otherwise not in accordance with law. 5 U.S.C. § 706(2)(A).

██ The Court has reviewed in great detail Attachment J to the FEIS, wherein the OCZM summarizes and responds to comments received both from other governmental agencies (state and federal) and from private interests addressed to the draft management program and EIS.[18] Attachment J includes OCZM's responses to similar concerns voiced by a number of reviewers (FEIS at J–1 through J–12) and its responses to comments received from individual reviewers (FEIS at J–13 through J–48), including plaintiffs (FEIS at J–29 through J–41) and various federal agencies (such as the Federal Energy Administration, the Federal Power Commission, and the Department of the Interior) whom plaintiffs have characterized as opposing § 306 approval (FEIS at J–17 through J–22).[19]

In their comments the various parties have raised most of the issues which plaintiffs have raised in this action. The Court finds additional support for the Acting Administrator's decision in the thoughtfulness and reasonableness with which OCZM has addressed the views of the various reviewers. The Acting Administrator had these comments and responses before him at the

18. Although it is not clear that Attachment J includes responses to the RDEIS and Program, published in April 1977, it appears so to do. *See* Attachment K ("Written Statements from Parties who Commented on the [CZMP] and the Revised Draft [EIS]").

19. Plaintiffs have characterized these agencies as having a "serious disagreement" with the Coastal Commission and the Acting Administrator regarding the approvability of the CZMP under § 306, the existence of which precludes the Acting Administrator's approving the Program until the disagreement has been mediated by the Secretary of Commerce pursuant to § 307(h). The Court rejects this argument. First, while the Secretary may not approve a management program "unless the views of Federal agencies principally affected by such program have been adequately considered" (§ 307(b)), the CZMA does not require that all such agencies concur in the Secretary's (Acting Administrator's) decision. Second, while the program approval regulations in effect at the time of the Acting Administrator's approval omitted to address § 307(h), the proposed regulations published on August 29, 1977 (42 Fed. Reg. 43552 [Part 923] and 43586 [Part 930])

provided guidance as to how the process of mediation should be triggered, operate, and terminate (*see* 15 C.F.R. §§ 923.54 and 930.-110–.116). The two key features which emerged in the proposed regulations were the voluntary nature of the mediation on the part of both the state and federal agencies and the need for a formal request for such on the part of at least one of them. Neither occurred in this instance. Finally, the Court notes that while FPC and FEA persisted in their view that the Acting Administrator grant only "preliminary approval" under § 305(d), the DOI favored § 306 approval. As stated earlier, the CZMA does not preclude the grant of § 306 approval merely because one or more affected federal agencies disfavor such action by the Acting Administrator. The Court notes further that by its literal terms § 307(h) does not apply to § 306 approval; rather, it applies to development of management programs under § 305 and to implementation of programs previously approved under § 306. Again, while the Court might have cast its vote for preliminary approval, that is not the standard of review to which we must adhere.

time of his approval of the CZMP and they lend further support to the nonarbitrary character of his decision.

The Court notes that while the interaction between the state (Coastal Commission) and various interested and affected federal agencies during the review process was substantially less than ideal in this instance, a situation of which the Acting Administrator was painfully aware,[20] nevertheless the requirement of § 307(b) that "the views of Federal agencies principally affected by such program have been adequately considered" before § 306 approval may be granted has been satisfied.

Without belaboring the point or embarking on a needless point-by-point analysis and refutation of plaintiffs' assertions regarding the Acting Administrator's findings under § 305(b), the Court, consistent with the previously-expressed view of the specificity which the Act requires, finds the "performance standards" approach embodied in the California Program to be permissible. The CZMA, as noted earlier, does not speak to this issue beyond defining "management program" in § 304(11).

The requirements of §§ 305(b) and 306(c), (d), and (e) do not constrain the state in the manner in which it meets them; nor does it constrain the Secretary or NOAA in establishing through regulations that which it will require of a management program in this regard. Congress has granted the Secretary and Acting Administrator considerable discretion. They have exercised it in promulgating approval regulations. The Court's review of these indicates that rulemaking itself has been an open process and has involved ongoing interaction between NOAA and interested parties.

■ As noted previously, the Court, cognizant of Congress' expression of approval for the manner in which NOAA and OCZM (and particularly Mr. Knecht) have carried out its mandate (see S.Rep.No.94–277, 94th Cong., 1st Sess. 30 (1975) U.S.Code Cong. & Admin.News 1976, p. 1768 (Legislative History at 756)), and further cognizant of Congress' resolving its original uncertainty over whether the CZMA should be administered by the Department of the Interior or the Department of Commerce in favor of the latter largely because of the "requisite oceanic, coastal ecosystem, and coastal land use expertise" found in NOAA (see S.Rep. No.94–277 at 7 n.5 (Legislative History at 733)), concludes that considerable deference is due NOAA's interpretation of its own regulations. In short, the Acting Administrator's findings and Attachment J of the FEIS, when viewed in the context of the legislative history of the Act and of the statutory language itself, satisfy the Court that approval of the California Program has not been arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.[21]

20. In response to a September 20, 1977 letter from the Assistant Administrator of Energy Resource Development at FEA, highly critical of the federal-state coordination in the review of the California Program, Acting Associate Administrator Knecht replied on September 23rd:

In the conclusion of your September 20 letter, you express displeasure at the manner in which federal-state relations were carried out in the review of the California program. I share this displeasure, and would like to meet with you to discuss further the general problem of relations between our agencies. Our experience in the review of the California program is unfortunately indicative of other programs for which we have sought comments. While the formation of the new Department of Energy may help to solidify policies and inter-agency relations, I fear there are some deep-seated problems which will remain and which require our mutual attention. We expect seven more states to seek program approval in coming months; neither of our agencies can afford repetition of the review process as it has proceeded in California.

The fact that coordination was poorer than might have been hoped does not require that this Court vacate the Acting Administrator's approval. His approval proceeded from full knowledge of the deficiencies.

21. The Court notes that while California's is only the third program to receive § 306 approval, the federal defendants have not been reluctant to send a program back for further development—to refuse § 306 approval in favor of preliminary approval—as in the case of Washington, whose application for § 306 approval was denied in May 1975. The state's program finally received § 306 approval in mid-1976. See H.Rep.No.94–878, 94th Cong., 2d Sess. 23 (1976) (Legislative History at 909).

B. *Adequate Consideration of the National Interest.*

Plaintiffs' fundamental grievance with the California Program stems from its assertion that the Program fails to satisfy the mandate of § 306(c)(8)—that before the Secretary grant approval to a management program under § 306 she find that it

provides for adequate consideration of the national interest involved in planning for, and in the siting of, facilities (including energy facilities in, or which significantly affect, such state's coastal zone) which are necessary to meet requirements which are other than local in nature.

Plaintiffs urge that the CZMA, particularly in light of the 1976 Amendments, requires an "affirmative commitment" on the part of the state before § 306 approval is proper. The California Program allegedly fails adequately to make that commitment in that its general lack of specificity, coupled with what plaintiffs characterize as California's overall antipathy to energy development (as embodied in the policies and practices of its Coastal Commission), combine to give the Coastal Commission a "blank check" effectively to veto any or all exploration and development activities subject to § 307(c)(3) simply by finding such activity not to be "consistent" with the CZMP.

Defendants, beyond taking issue with plaintiffs' characterization of California's energy posture, assert first, that plaintiffs' premise that the Act requires an affirmative commitment is incorrect as a matter of law and second, that the Program contains adequate consideration of national energy interests. Defendants contend that the CZMP contains "performance standards and criteria" more than adequate to satisfy the requirements of the CZMA and serve as a guide to plaintiffs in planning their activities in the coastal zone. Implicit in the various provisions of the Coastal Act (and in particular those in §§ 30001.2 and 30260–64) and in Chapter 11 of the Program Description is a wholly adequate consideration of the national energy interest.

Plaintiffs apparently focus on language in H.Rep.No.92–1049 (which accompanied H.R. 14146) to the effect that, "if the program as developed is to be approved and thereby enable the State to receive funding assistance under this title, the State *must take into account and must accommodate* its program to the specific requirements of various Federal laws which are applicable to its coastal zone." Legislative History at 321. The report continues:

To the extent that a State program does not recognize these overall national interests, as well as the specific national interest in the generation and distribution of electric energy . . . or is construed as conflicting with any applicable statute, the Secretary may not approve the State program until it is amended to recognize those Federal rights, powers, and interests.

*Id.* at 322.

It is to be noted that the reference in the House Report to the state's need to "accommodate" its program is to "the specific requirements of various [applicable] Federal laws." It is not a requirement that the state program expressly "accommodate" energy interests. In the program approval regulations published on January 9, 1975 (40 Fed.Reg. 1683), NOAA stated that:

A management program which integrates . . . the siting of facilities meeting requirements which are of greater than local concern into the determination of uses and areas of Statewide concern will meet the requirements of Section 306(c)(8).

15 C.F.R. § 923.15(a). In subsection (b) NOAA amplified on the above requirement.

. . . The requirement should not be construed as compelling the States to propose a program which accommodates certain types of facilities, but to assure that such national concerns are included at an early stage in the State's planning activities and that such facilities not be arbitrarily excluded or unreasonably restrict-

ed in the management program without good and sufficient reasons. . . . No separate national interest "test" need be applied and submitted other than evidence that the listed national interest facilities have been considered in a manner similar to all other uses, and that appropriate consultation with the Federal agencies listed has been conducted.

The Coastal Zone Management Act Amendments of 1976, Pub.L. 94–370 ("1976 Amendments"), while largely prompted by the 1973 Arab oil embargo and while expressly recognizing the national interest in the planning for and siting of energy facilities, nevertheless did not alter the requirement of "adequate consideration" in § 306(c)(8) or make any changes in the degree of specificity required under the Act. Rather, recognizing that coastal states like California were currently burdened by the onshore impacts of Federal offshore (OCS) activities and likely to be burdened further by the plans for increased leases on the OCS, Congress sought to encourage or induce the affected states to step up their plans *vis-à-vis* such facilities.

The primary means chosen to accomplish this result was the Coastal Energy Impact Program ("CEIP") contained in new § 308. As the Conferees explained, the purpose of the 1976 Amendments was

> to coordinate and further the objectives of national energy policy by directing the Secretary of Commerce to administer and coordinate, as part of the [CZMA], a coastal energy impact program.
>
> . . . The conference substitute follows both the Senate bill and the House amendment in amending the 1972 Act to encourage new or expanded oil and natural gas production in an orderly manner from the Nation's outer Continental Shelf (OCS) by providing for financial assistance to meet state and local needs resulting from specified new or expanded energy activity in or affecting the coastal zone.

H.Rep.No.94–1298, 94th Cong., 2d Sess. 23 (1976), U.S.Code Cong. & Admin.News 1976, pp. 1820, 1821 (Legislative History at 1073).

The formula Congress provided for calculating a state's share of the Coastal Energy Impact Fund ("the Fund") established to carry out the CEIP's purposes is itself further evidence of the congressional intention to provide "built-in incentives for coastal states to assist in achieving the underlying national objective of increased domestic oil and gas production." H.Rep.No.94–1298 at 25, U.S.Code Cong. & Admin.News, p. 1822. (Legislative History at 1075).

> The formula, as so constructed, provides incentives to coastal states (if they are interested in increasing their share of the funds appropriated for this purpose) to encourage and facilitate achievement of the basic national objective of increasing domestic energy production. This provision would be in harmony with sound coastal zone management principles because Federal aid would be available only for states acting in accord with such principles. For example, since the grant is based on new leasings, production, first landings, and new employment, it is to the state's interest to apply the "consistency" provisions and related processes to the issuance of oil exploration, development and production plans, licenses, and permits as quickly as possible rather than to postpone decision-making for the statutory 6-month period.

*Id.* The Congress was particularly careful to circumscribe the role of the federal government in particular siting decisions. Thus, § 308(i) provides:

> The Secretary shall not intercede in any land use or water use decision of any coastal state with respect to the siting of any energy facility or public facility by making siting in a particular location a prerequisite to, or a condition of, financial assistance under this section.

This provision is consistent with the approach of the CZMA as a whole to leave the development of, and decisions under, a management program to the state, subject to the Act's more specific concern that the development and decision-making process occur in a context of cooperative interaction, coordination, and sharing of informa-

tion among affected agencies, both local, state, regional, and federal. This last, especially as regards energy facility planning, is the policy behind the Energy Facility Planning Process ("EFPP") of § 305(b)(8) and the Interstate Grants provision of new § 309 (which encourages the coastal states to give high priority to coordinating coastal zone planning utilizing "interstate agreements or compacts"). It should be noted that the only amendment to the national interest requirement of § 306(c)(8) effectuated by the 1976 Amendments is the additional requirement that in fulfilling its obligation to provide "adequate consideration of the national interest" in the case of energy facilities, the state also give such consideration "to any applicable interstate energy plan or program" established under § 309.

 The Court rejects plaintiffs' argument that affirmative accommodation of energy facilities was made a *quid pro quo* for approval under § 306 by the 1976 Amendments. In addition to the above, the Court notes that Congress itself did not assume that such siting was automatically to be deemed necessary in all instances. For instance, in its report on H.R. 3981, the Committee on Merchant Marine and Fisheries stated that the addition of the EFPP in § 305(b)(8)

> reflects the Committee's finding that increasing involvement of coastal areas in providing energy for the nation is likely, as can be seen in the need to expand the Outer Continental Shelf petroleum development. State coastal zone programs should, therefore, specifically address how major energy facilities are to be located in the coastal zone *if* such siting is necessary. Second, the program shall include methods of handling the anticipated impacts of such facilities. The Committee in no way wishes to accelerate the location of energy facilities in the coasts; on the contrary, it feels a disproportionate share are there now. . . . There is no intent here whatever to involve the Secretary of Commerce in specific siting decisions.

H.Rep.No.94–878 at 45–46 (Legislative History at 931–32) (emphasis supplied). The concern that the CEIP not encourage the siting in the coastal zone of energy facilities which could be located elsewhere is embodied in § 308. *See* H.Rep.No.94–878 at 15 and 26 (Legislative History at 900 and 912).

The Senate Committee on Commerce, in reporting S. 586 to the full Senate, stated:

> The Secretary of Commerce (through NOAA) should provide guidance and assistance to States under this section 305(b)(8), and under section 306, to enable them to know what constitutes "adequate consideration of the national interest" in the siting of facilities necessary to meet requirements other than local in nature. The Committee wishes to emphasize, consistent with the overall intent of the Act, that this new paragraph (8) requires a State to develop, and maintain a planning process, but does not imply intercession in specific siting decisions. *The Secretary of Commerce (through NOAA), in determining whether a coastal State has met the requirements, is restricted to evaluating the adequacy of that process.*

S.Rep.No.94–277 at 34, U.S.Code Cong. & Admin.News 1976, p. 1801 (Legislative History at 760) (emphasis supplied).

Consistent with this mandate, NOAA has promulgated revised program approval regulations (43 Fed.Reg. 8378, March 1, 1978). These interim final rules follow the submission of comments on the proposed rules published on August 29, 1977 (42 Fed.Reg. 43552). The Court looks to the revised regulations because they reflect NOAA's interpretation of any changes wrought by the 1976 Amendments, the former regulations against which the California Program was tested having been promulgated after the Arab oil embargo but before the 1976 Amendments.

In its response to several reviewers' suggestion that § 306(c)(8) be interpreted to require that facilities be accommodated in a State's coastal zone, the agency reiterated the position it has maintained since the inception of the CZMA that

the purpose of "adequate consideration" is to achieve the act's "spirit of equitable balance between State and national interests." As such, consideration of facilities in which there may be a national interest must be undertaken within the context of the act's broader finding of a "national interest in the . . . beneficial use, protection, and development of the coastal zone" (Section 302(a)). Subsection 302(g) of the Act gives "high priority" to the protection of natural systems. Accordingly, while the primary focus of subsection 306(c)(8) is on the planning for and siting of facilities, adequate consideration of the national interest in these facilities must be based on a balancing of these interests relative to the wise use, protection and other development of the coastal zone. As the Department of Energy noted in its comments on the proposed regulations:

> The Act presumes a balancing of the national interest in energy self-sufficiency with State and local concerns involving adverse economic, social, or environmental impacts.

43 Fed.Reg. 8379.

 Section 306(c)(8) is treated at length in 15 C.F.R. § 923.52. After generally noting that one "need not conclude . . . that any and all such facilities proposed for the coastal zone need be sited therein," the regulation proceeds to set forth requirements which must be met by the management program in order to satisfy § 306(c)(8). While these are considerably more detailed than those contained in its predecessor (15 C.F.R. § 923.15, January 9, 1975), they do not change the basic tenor of the rule as interpreted by NOAA. Having previously determined that the Acting Administrator's utilization of the then-existing regulations was proper—indeed, to have applied proposed regulations arguably would have been improper—and having determined that it was not abuse of discretion to proceed with approval of the California Program rather than await promulgation of final revised approval regulations, given the fact that the proposed regulations effected no fundamental change of philosophy but merely a "shift in emphasis" (42 Fed.Reg. 43552), the Court concludes that the Acting Administrator's finding that the CZMP satisfied § 306(c)(8) is neither arbitrary nor capricious.

The Court notes further in this regard that the standards established by the Coastal Act (and in particular §§ 30260–64 and 30413) for making energy facilities siting decisions, in the words of the Coastal Commission staff, "establish the general findings that must be made to authorize coastal dependent industrial facilities, liquefied natural gas terminals, oil and gas developments, refineries, petrochemical facilities and electric power plants." FEIS, Part II (Chapter 9) at 66. The key to the California approach, and one which the Acting Administrator and this Court find acceptable under the CZMA, is that the standards require that "findings" be made upon which specific siting decisions ensue. For instance, in dealing with the siting of oil tanker facilities, § 30261(a) requires that

> . . . [t]anker facilities shall be designed to (1) minimize the total volume of oil spilled, (2) minimize the risk of collision from movement of other vessels, (3) have ready access to the most effective feasible containment and recovery equipment for oil spills, and (4) have onshore deballasting facilities to receive any fouled ballast water from tankers where operationally or legally required.

As can readily be seen from these provisions, whether a particular tanker facility siting proposal will be deemed "consistent" with these requirements of the California Program will turn on specific findings of a factual nature. The California Program sensibly does not attempt to map out in advance precisely what type or size tanker facilities will be found to meet these requirements in particular areas of its almost 1,000-mile coastline. Rather, by its very nature, the Coastal Act encourages plaintiffs with a particular facility in mind to address themselves to the standards set forth in the Coastal Act and to plan such a facility in cooperation and communication with the Coastal Commission from the in-

ception. This approach seems consonant with the overall approach of the CZMA itself. In this regard it is noteworthy that the Senate Committee on Commerce, in summarizing the "key findings" of a number of reports made under the aegis of the committee-created National Ocean Policy Study, stated that "coastal States often have been criticized unfairly for delaying the siting of energy facilities when such action often is the result of lack of information and planning." S.Rep.No.94–277 at 3, U.S.Code Cong. & Admin.News 1976, p. 1770 (Legislative History at 729). The CZMP takes an approach which has received the congressional blessing. To the extent plaintiffs seek not guidance with respect to the way in which coastal resources will be managed but instead a "zoning map" which would implicitly avoid the need to consult with the state regarding planned activities in or affecting its coastal zone, the Court rejects their position. While wholly sympathetic to the legitimate concerns of corporate officers and planners who must conform their activities to the standards of the CZMP, the Court nevertheless concludes that the Acting Administrator's finding that the Program satisfies § 306(c)(8) is supportable and hence not arbitrary or capricious. It proceeds from a correct interpretation of the CZMA.

Finally, the Court notes that both the California Program and the CZMA contain safeguards to protect plaintiffs from arbitrary exercise by the Coastal Commission of its § 307 consistency powers. First, plaintiffs under the Coastal Act may seek judicial review of a decision of the Coastal Commission finding a specific proposed activity of plaintiffs to be inconsistent with the CZMP. Such review certainly may encompass a challenge to the Commission's interpretation of the California Program as well as a challenge to specific findings upon which the determination presumably would be based. Second, with respect to an adverse consistency determination regarding any proposed activity for which a federal license or permit is required or which involves an OCS plan, the party against whose activity such a determination has been made may seek review by the Secretary of Commerce (who could also undertake review on her own initiative) on the grounds that "the activity is consistent with the objectives of this title or is otherwise necessary in the interest of national security." § 307(c)(3)(A) and (B).[22] Third, under § 312(a) the Secretary is obliged to conduct "a continuing review of (1) the management programs of the coastal states and the performance of such states with respect to coastal zone management; and (2) the coastal energy impact program provided for under section 308." Subsection (b) provides:

The Secretary shall have the authority to terminate any financial assistance extended under section 306 . . . if (1) [s]he determines that the state is failing to adhere to and is not justified in deviating from the program approved by the Secretary . . . .

In short, both as regards specific determinations of inconsistency and as regards gener-

---

**22.** In promulgating regulations under § 307, NOAA has rejected the invitation of some reviewers to broaden the grounds of secretarial review. Some reviewers of the proposed regulations (41 Fed.Reg. 42879, September 28, 1976)

urged that appellants should be able to argue on appeal that the State agency's consistency objection was not in accordance with the requirements of the management program. Other parties urged that the appeal process should be open to third party challenges to State agency concurrences which violate the requirements of the management program. No changes were made in response to these comments, and the regulations now clearly

indicate that the Secretary will only consider appeals which are based on grounds that the activity either (i) is consistent with the purposes or objectives of the Act, or (ii) is necessary in the interest of national security.

42 Fed.Reg. 43586, 43595 (August 29, 1977) (Proposed Rules). The agency noted that general review of the manner in which a state implemented its approved program, "including the manner in which consistency concurrences and objections are issued," shall be reviewed by OCZM under its continuing review obligation of § 312. *Id.* The final rules were published March 13, 1978 (43 Fed.Reg. 10510). *See* 15 C.F.R. §§ 930.120–.122.

al trends in and manner of issuance of such determinations, plaintiffs are amply protected by and have various forms of recourse under the California Program itself and §§ 307 and 312 of the CZMA.

## APPROVAL BY THE FEDERAL DEFENDANTS

Plaintiffs have charged that the procedures followed by the state in developing and adopting, and by the federal defendants in approving, the California Program violated both the CZMA and NEPA.

Section 306(c)(1) requires the Secretary to find that

[t]he state has developed and adopted a management program for its coastal zone in accordance with rules and regulations promulgated by the Secretary, after notice, and *with the opportunity of full participation* by relevant Federal agencies, state agencies, local governments, regional organizations, port authorities, and other interested parties, public and private, *which is adequate to carry out the purposes of this title* and is consistent with the policy declared in section 303 of this title.

(Emphasis supplied.) The Acting Administrator has so found. Findings at 13–14 (and references to the FEIS contained therein). Section 306(c)(3) amplifies the requirement of § 306(c)(1) by demanding a finding be made that "[t]he state has held public hearings in the development of the management program." This too has been found. Findings at 16 (and references to the FEIS contained therein).

Plaintiffs' claims of invalid adoption by the state having been discussed previously, the Court merely adds that the process of developing a coastal zone management program for the state of California has been ongoing since the enactment of Proposition 20 (the California Coastal Zone Conservation Act of 1972) and that the Acting Administrator's finding that that process has been open within the meaning of § 306(c)(1) and (3) is supported by the record. Under the arbitrary and capricious standard applicable to such findings, they must be sustained.

Plaintiffs mount an assault on the review process undertaken by the federal defendants in approving the CZMP under § 306, focusing on the purported inadequacies of the environmental review process culminating in the FEIS. As noted earlier, a challenge under NEPA invites broader-ranging evidentiary review (not limited to the administrative record) and requires application of the observance of procedure standard of review. 5 U.S.C. § 706(2)(D); *Cady v. Morton, supra,* 527 F.2d at 793, citing *Trout Unlimited v. Morton, supra,* 509 F.2d at 1282, and *Lathan v. Brinegar, supra,* 506 F.2d 677; *Ethyl Corp. v. EPA, supra,* 176 U.S.App.D.C. at 406 n.71, 541 F.2d at 34 n.71. Having done so, the Court concludes that the environmental review process here followed and the FEIS produced thereby are adequate under § 102(2)(C) of NEPA (42 U.S.C. § 4332(2)(C)).

Section 102(2)(C) mandates that an EIS address:

(i) the environmental impact of the proposed action;

(ii) any adverse environmental effects which cannot be avoided should the proposal be implemented;

(iii) alternatives to the proposed action;

(iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity; and

(v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented.

Plaintiffs contend first, that the federal defendants utilized the environmental review process not to conduct a *bona fide* environmental review but to advocate a prior decision to grant final approval to the CZMP; second, that the FEIS is deficient because the Program discussed therein differs substantially from that disclosed in the RDEIS; third, that it fails to adequately discuss possible alternatives to § 306 approval; fourth, that it fails to consider all available relevant information; and fifth, that it fails to discuss potential and una-

voidable adverse impacts of approving and implementing the CZMP.

The Court discusses these claims in order.

■ First, the Court finds nothing improper in the federal defendants' informing the public and other organs of government of its tentative conclusion that the California Program meets the requirements of § 306 so as to qualify for final approval. The nature of the cooperative interaction between the state and federal governments envisioned by the CZMA in the development of a management program makes it wholly unrealistic to assume that the federal agency charged with reviewing that program will entertain no preliminary conclusions as to its adequacy under the Act.

■ With respect to plaintiffs' second claim—that the RDEIS and FEIS differ substantially in their description of the elements of the California Program—the Court concludes that such claim lacks merit. First, the two statutory elements of the Program other than the Coastal Act both were noted in the RDEIS (at 8, 12, and 77). Neither establishes standards in the sense that the Coastal Act does; rather, these companion statutes provide a portion of the implementation authority required by § 306(c)(6), (7), and (d) of the CZMA. Second, the RDEIS contains the original version of the Program Description found in the FEIS. As discussed at length in another section of this memorandum, Chapter 11 of the Program Description has been formally adopted by the Coastal Commission; and the remaining chapters, being of an essentially descriptive nature, were not required to be. The procedures followed may have been sloppy, but the Court cannot say that the failure expressly to designate Part II of the RDEIS and "element" of the CZMP was fatal—particularly in light of the Court's conclusions regarding the legal status of the Program Description. Finally, the Court notes that the revisions made in the Program Description were largely prompted by comments received on the original Program Description, including those received from plaintiffs.

■ Plaintiffs' third argument—that the FEIS fails adequately to discuss alternatives to § 306 approval—is premised on plaintiffs' insistence that the federal defendants should have denied final approval and instead granted the CZMP preliminary approval under § 305(d), particularly in light of the fact that the local coastal programs required by the Coastal Act (not due until 1980) will add the requisite degree of specificity to enable the Program to qualify for § 306 approval. While there is support for plaintiffs' position in the legislative history surrounding the addition of "preliminary approval" to § 305 effected by the 1976 Amendments (H.Rep.No.94–878, 94th Cong., 2d Sess. 48 (1976) (Legislative History at 934)), nevertheless the FEIS discusses this alternative to § 306 approval and rejects it on the basis of a reasonable construction of §§ 306(e)(1) (dealing with permissible implementation techniques for control of land and water uses) and 305(d), the NOAA regulations relevant thereto (15 C.F.R. § 923.26), the pertinent legislative history, and the application of the above to the provisions of the CZMP. FEIS at 184–85. The federal defendants' conclusion—that "if a state has the necessary authorities in place and will employ acceptable implementation techniques, the 'preliminary approval' option is inappropriate" (FEIS at 184)—is reasonable in order to give harmonious and full effect to §§ 305(d) and 306(e)(1). Again, while the Court, if faced with the choice, might have opted for preliminary approval, we may not substitute our judgment for that of the Acting Administrator. It is sufficient for present purposes to note that, contrary to plaintiffs' contention, the FEIS does adequately discuss this alternative.

■ Plaintiffs' final two claims are premised on the alleged failure of the FEIS to discuss the adverse impact nationwide should California utilize its § 307 consistency powers to retard or preclude OCS and related energy development. Plaintiffs also assert that the FEIS fails adequately to discuss the impact of the CZMP on the "socio-economic" environment (e. g., impact

on "urban sprawl"). The Court rejects this argument.

As this Circuit has stated:

. . . [A]n EIS is in compliance with NEPA when its form, content, and preparation substantially (1) provide decision-makers with an environmental disclosure sufficiently detailed to aid in the substantive decision whether to proceed with the project in the light of its environmental consequences, and (2) make available to the public, information of the proposed project's environmental impact and encourage public participation in the development of that information.

*Trout Unlimited v. Morton, supra,* 509 F.2d at 1283. "An EIS need not discuss remote or highly speculative consequences. . . . [The] adequacy of the content of the EIS should be determined through use of a rule of reason." *Id.* In elaborating on this "rule of reason" the Second Circuit has observed that

an EIS need not be exhaustive to the point of discussing all possible details bearing on the proposed action but will be upheld as adequate if it has been compiled in good faith and sets forth sufficient information to enable the decision-maker to consider fully the environmental factors involved and to make a reasoned decision after balancing the risks of harm to the environment against the benefits to be derived from the proposed action, as well as to make a reasoned choice between alternatives. [Citations omitted.]

*County of Suffolk v. Secretary of the Interior, supra,* 562 F.2d at 1375.

In this instance, the inadequacies raised by plaintiffs rest on the highly speculative assumption that in implementing its management program California will abuse its § 307 consistency powers, the California

courts will acquiesce therein, and, further, the Secretary of Commerce will fail to discharge her duties under §§ 307(c)(3) and 312. As stated during our discussion of the ripeness issue, the Court declines to make such an assumption—nor must the federal defendants in preparing the FEIS engage in such speculation.

The Court views the situation with which it is here presented as not unlike that presented in *Life of the Land v. Brinegar,* 485 F.2d 460 (9th Cir. 1973). In that case an action was brought by environmental groups to enjoin construction of a new seaward runaway at Honolulu International Airport. The defendants in preparing the EIS determined that it was unnecessary to undertake air pollution studies because of the very nature and location of the proposed project. In rejecting plaintiff-appellants' claim that such omission was fatal to the adequacy of the EIS, this Circuit remarked:

The Reef Runway will relocate aircraft takeoffs, the major source of aircraft air pollution, 6,700 feet seaward, and away from the populated areas of Honolulu. The essence of this project, therefore, involves moving the sources of the air pollution away from people. The federal and state officials concluded that detailed air pollution studies were unnecessary, on the premise that at the very least, the project was extremely unlikely to worsen the air quality in any relevant sense.

*Id.* at 470.

Similarly, the "essence" of the CZMP, in accordance with §§ 302 and 303 of the CZMA, is sensitivity to environmental concerns in establishing standards for utilization of the coastal zone; consequently, fewer and less detailed environmental studies would be expected because the Program emphasizes environmental preservation.[23]

---

**23.** The Court is not unmindful of the substantial question raised by NRDC concerning plaintiffs' standing under NEPA to assert claims founded principally in and directed primarily to economic rather than environmental well-being. *See, e. g., Churchill Truck Lines, Inc. v. U. S.,* 533 F.2d 411 (8 Cir. 1976); *Clinton Community Hospital Corp. v. Southern Maryland*

*Medical Center,* 510 F.2d 1037 (4th Cir.), *cert. denied,* 422 U.S. 1048, 95 S.Ct. 2666, 45 L.Ed.2d 700 (1975). While cognizant of the irony of plaintiffs' pressing claims based on NEPA's strictures, the Court, construing "environmental impact" more broadly, nevertheless has chosen to address the merits of those claims.

Finally, the Court notes that the act of approving the California Program in itself does not result in the undertaking of any specific project by the state or federal governments or any private user(s) of the coastal zone. The concerns raised by plaintiffs—in particular, the alleged omission in the FEIS of an adequate discussion of the significance of permitting OCS development to go forward and the impact of precluding such development—will be addressed in connection with the preparation and dissemination of environmental impact statements for specific proposed activities. The environmental review here undertaken resembles that frequently utilized where a "multistage" project is involved; consequently, the failure of the FEIS to discuss such possibilities is justified on this alternative ground. The Second Circuit addressed this issue in *County of Suffolk, supra.* That case involved preparation of an EIS in connection with the proposed lease-sale by the Department of the Interior of federal lands on the OCS to petroleum companies. There, in reversing the district court's finding that that EIS was inadequate in its failure to explore the possibility that state and local governments affected by such lease-sale might bar the landing of pipelines on their shores and thereby in necessitating the use of tankers increase the hazards of oil pollution, the Court reasoned:

> . . . [T]he extent to which treatment of a subject in an EIS for a multistage project may be deferred, depends on two factors: (1) whether obtaining more detailed useful information on the topic of transportation is "meaningfully possible" at the time when the EIS for an earlier stage is prepared, see *Natural Resources Defense Council v. Morton,* [148 U.S.App.D.C. 5, at 15,] 458 F.2d [827] at 837, and (2) how important it is to have the additional information at an earlier stage in determining whether or not to proceed with the project, see *National Resources Defense Council v. Callaway,* 524 F.2d at 88.
>
> *If the additional information would at best amount to speculation as to future event or events, it obviously would not be of much use as input in deciding whether to proceed.* As we said in *Callaway, supra,* referring to *Morton, supra* :
>
> > "NEPA does not require a 'crystal ball' inquiry . . . An EIS is required to furnish only such information as appears to be reasonably necessary under the circumstances for evaluation of the project rather than to be so all-encompassing in scope that the task of preparing it would become either fruitless or well nigh impossible, *Indian Lookout Alliance v. Volpe,* 484 F.2d 11 (8th Cir. 1973). A government agency cannot be expected to wait until a perfect solution of environmental consequences of proposed action is devised before preparing and circulating an EIS." 524 F.2d at 88.
>
> Where the major federal action under consideration, once authorized, cannot be modified or changed, it may be essential to obtain such information as is available, speculative or not, for whatever it may be worth in deciding whether to make the crystallized commitment (e. g., the construction of a bridge of a specified type between two precise points). But *where a multistage project can be modified or changed in the future to minimize or eliminate environmental hazards disclosed as the result of information that will not become available until the future, and the Government reserves the power to make such a modification or change after the information is available and incorporated in a further EIS, it cannot be said that deferment violates the "rule of reason." Indeed, in considering a project of such flexibility, it might be both unwise and unfair not to postpone the decision regarding the next stage until more accurate data is at hand.*

562 F.2d at 1378 (emphasis supplied). The court concluded that "projection of specific pipeline routes was neither 'meaningfully possible,' nor 'reasonably necessary under the circumstances.' " *Id.* at 1382. This factor of multistage projects whose various stages are "substantially independent" of one another similarly has been considered

by this Circuit in assessing the adequacy of an EIS. *See, e. g., Cady v. Morton, supra,* 527 F.2d at 794 n.7; *Trout Unlimited v. Morton, supra,* 509 F.2d at 1285.

The Court concludes that this action presents an analogous situation to which this reasoning applies. Approval and implementation of the CZMP no more indicates which of potentially dozens of projects will be certified as consistent (and undertaken subject to what conditions) than the decision of the Department of the Interior to proceed with the lease-sale of a large tract of federal OCS lands indicated which of potentially dozens of exploration and development projects would be permitted (and under what conditions).

The Court concludes, as did the court in *Cady v. Morton supra,* that "although the EIS could be 'improved by hindsight,' it has satisfied the intent of the statute. *National Forest Preservation Group v. Butz,* 485 F.2d 408, 412 (9th Cir. 1973)." 527 F.2d at 797.

 The length, complexity and convolutions of this memorandum and of the findings and conclusions set forth herein speak louder and much more eloquently than the words themselves. The message is as clear as it is repugnant: under our so-called federal system, the Congress is constitutionally empowered to launch programs the scope, impact, consequences and workability of which are largely unknown, at least to the Congress, at the time of enactment; the federal bureaucracy is legally permitted to execute the congressional mandate with a high degree of befuddlement as long as it acts no more befuddled than the Congress must reasonably have anticipated; if ultimate execution of the congressional mandate requires interaction between federal and state bureaucracy, the resultant maze is one of the prices required under the system.

The foregoing shall constitute the Court's findings of fact and conclusions of law.

The administrative action is affirmed; the petition is denied, each side to bear its costs.